951 So.2d 117 (2007)
SANDLAKE RESIDENCES, LLC, and Sand Lake, etc., Appellants,
v.
Robert V. OGILVIE and Marilyn Ogilvie, Appellees.
No. 5D06-2520.
District Court of Appeal of Florida, Fifth District.
March 16, 2007.
*118 Richard M. Coln and Harry W. Carls of Taylor & Carls, P.A., Maitland, and Peter P. Hargitai, Cynthia L. Hain and Stuart F. Williams of Holland & Knight, LLP., Jacksonville, for Appellant.
Jack W. Shaw, Jr., of Jack W. Shaw, Jr., P.A., Winter Park, and Carl D. Motes, Orlando, for Appellee.
GRIFFIN, J.
Sandlake Residences, LLC and Sand Lake Private Residences Condominium Association, Inc. ["Sandlake"] appeal the trial court's non-final order granting Robert V. Ogilvie and Marilyn Ogilvie ["Ogilvies"] a temporary injunction. We conclude that the criteria for entry of a temporary injunction were not met and vacate the injunction.
Initially, the Ogilvies owned forty acres of land, part of which fronted Turkey Lake Road. The Ogilvies' home is situated some distance back, away from Turkey Lake Road, on this property. In 1993, the Ogilvies sold a portion of their property to Sandlake's predecessor in interest, Sand Lake Joint Ventures.[1] The portion of the property they sold was the part adjacent to Turkey Lake Road. In conjunction with this sale, Sand Lake Joint Ventures conveyed an easement to the Ogilvies. This easement provided the Ogilvies access to Turkey Lake Road from their home located on the unsold portion of their land.
Under the terms of the easement agreement, Sand Lake Joint Ventures granted the Ogilvies[2] a non-exclusive perpetual easement for pedestrian and vehicular ingress and egress over a permanent access road that Sand Lake would build on its property. Further, under the agreement, *119 Sand Lake Joint Ventures agreed to install an electronic gate ["rear gate"] on the permanent access road at the entrance to the Ogilvies' property.[3]
Sandlake installed a second entrance gate ["the front gate"] across the permanent access road at the point where it intersected with Turkey Lake Road, which went into operation in 2006. It also placed speed bumps across the permanent access road on either side of the gate.
Sandlake provided the several owners having an easement right over its access road, including the Ogilvies, several means to pass through the front gate. The Ogilvies could open the gate by using a single button remote provided to them by Sandlake, by entering a personal access code into the gate's key pad, or by calling Sandlake's office during office hours. Further, the Ogilvies could call their own cell phone number from the gate, and then "buzz" themselves in by pressing nine. If the Ogilvies wanted to admit a guest or delivery person, they could either provide that person with their personal access code or have the person call from the gate, and then press nine to "buzz" them in. The gate automatically opens for exiting vehicles.
On June 22, 2005, the Ogilvies sued,[4] seeking a determination that the gate and speed bumps violated the terms of the Easement Agreement and interfered with their right of egress and ingress under that agreement. Thereafter, the Ogilvies filed a motion for a temporary injunction to require Sandlake to remove the speed bumps from the access road and to render the gate non-operational.
Sandlake responded that the Ogilvies could not show that it had a substantial likelihood of success on the merits because the easement agreement did not prohibit the installation of a gate at the entrance to the permanent access road, and the Ogilvies could not show that the gate constituted an unreasonable interference with their right of passage.
After an evidentiary hearing was held on the temporary injunction motion, the trial court entered the temporary injunction, which required Sandlake to leave the gate open and remove the speed bumps located on either side of the gate. The trial court's decision to enjoin operation of the gate appears to have been based on its conclusion that the Easement Agreement expressly gave the Ogilvies the right to have an easement constructed according to the site plan referred to in the easement, which did not include a front gate. Having reached this conclusion, the trial court decided not to address the question whether the gate unreasonably interfered with the Ogilvies' right of passage over the easement.
On appeal, Sandlake takes issue only with the portion of the temporary injunction order that required it to leave the gate open. It does not appeal the portion of the order requiring removal of the speed bumps.
In determining whether an easement agreement conveys a particular right, rules of contract interpretation apply. Am. Quick Sign, Inc., v. Reinhardt, 899 So.2d 461, 465 (Fla. 5th DCA 2005). Thus, the rule is that "in reviewing the documents creating an easement, if the *120 language is clear, concise, and unambiguous" effect must be given "to the terms as stated without resort to other rules of construction to ascertain their meaning." Id. However, if terms of the agreement are ambiguous, the court may consider extrinsic evidence in determining "the intent of the parties at the time the document establishing the easement was created." Id. The language of a provision is ambiguous when it is fairly interpreted as having more than one meaning.
Two Florida cases address situations similar to the one present. In BHB Development v. Bonefish Yacht Club Homeowners Ass'n, 691 So.2d 1174 (Fla. 3d DCA 1997), a homeowners' association obtained a private right-of-way easement for ingress and egress over a portion of BHB Development's property. BHB later erected a locked gate across the easement for security reasons, and offered keys to the members of the homeowners' association. Id. at 1175-76.
The issue in the case was whether BHB had the right to erect the gate. The Third District Court stated the general rule as follows:
[T]he grant of a way without reservation of the right to maintain gates does not necessarily preclude the owner of the land from doing so, and unless it is expressly stipulated that the way shall be an open one, or it appears from the terms of the grant or the circumstances that such was the intention, the owner of the servient estate may erect gates across the way, if they are constructed so as not to interfere unreasonably with the right of passage. (Emphasis added.)
Id. at 1176 (quoting 20 FLA. JUR. 2d Easements § 36 (1980)). Thus, under BHB Development, analysis of whether a gate may be erected over an easement begins with a determination of whether the terms of the easement expressly give the servient estate owner the right to erect a gate, or expressly or implicitly provide that the pathway will be an open one. If the easement agreement does not address the issue, whether or not a gate may be erected depends on whether the gate would unreasonably interfere with the easement holder's right of passage.
In BHB Development, the easement did not reserve to BHB the right to maintain a locked gate, nor did it expressly or implicitly provide that the way had to be an open one. Id. The homeowners' association had proffered evidence that the gate would be inconvenient for two reasons. First, it would require guests and lessees to carry a key or access code to enter and exit the easement. Second, it would require the easement holder to exit his vehicle to unlock and open the gate and then, after passing through the gate, to exit the vehicle again to close and relock the gate. Id. Based on this evidence, the court concluded that the gate constituted a substantial and impermissible interference with the dominant easement holders' rights to use the easement, and affirmed the trial court's order to remove the gate. Id.
In Tortoise Island Communities v. Roberts, 394 So.2d 568 (Fla. 5th DCA 1981), a group of lot owners held a canal easement across an island, which provided them with access to the Indian River. The issue in the case was whether the island owner had the right to build any kind of bascule bridge over the canal.[5]
This court noted in Tortoise Island that the easement holder has the right of free passage "to the degree and amount originally *121 contemplated by the parties," and that the owner of the servient estate may use his property, including the portion underlying the easement, "in such a way that will not interfere with the easement owner's right of passage." Id. at 569. This court then held:
The record in this case fails to show any basis to sustain the permanent injunction against any kind of bascule bridge under any circumstances. The appellants may be able to bridge the canal so as not to materially interfere with appellees' easement rights, and they should not be foreclosed from making such a showing.
Id.
As discussed above, whether a gate may be erected over an easement begins with a determination of whether the terms of the easement agreement expressly give the servient estate owner the right to erect a gate, or expressly or implicitly provide that the pathway will be an open one. BHB Dev., 691 So.2d at 1176. If the easement agreement does not address the issue, whether a gate may be erected depends on whether the gate would unreasonably interfere with the easement holder's right of passage.
In pertinent part, the terms of the easement agreement at issue here provide:
5. Prior to the completion of construction of the apartment complex to be located on the Grantor's parcel, the Grantor shall construct, at the Grantor's expense, a permanent access road (herein referred to as the "Permanent Access Road"), together with a concrete block wall (hereinafter referred to as the "Concrete Block Wall"). The preliminary site plan to the property, entitled The Vinings at Sand Lake Grading and Drainage Plan "A" and "B", dated October 28, 1992, prepared by Robert Blendon, P.E., bearing Job No. 93-002 (the "Site Plan") reflects the approximate location of the Permanent Access Road and the Concrete Block Wall. The Site Plan is attached hereto and made a part hereof as Exhibit "C". Grantor hereby grants to Grantees . . . a non-exclusive perpetual easement for pedestrian and vehicular ingress and egress over the Permanent Access Road in accordance with the terms set forth herein. Grantor hereby agrees that the Permanent Access Road shall be a named right-of-way . . . and that appropriate signage will be erected . . . As set forth in the Site Plan, Grantor represents that the Permanent Access Road shall be at least twenty-two feet (22') in width; provided, however, that the Permanent Access Road may narrow to a width of eighteen feet (18') of paved area in that portion of the Permanent Access Road which is adjacent to the east side of the Concrete Block Wall . . . The Permanent Access Road shall be constructed substantially in accordance with all applicable Orange County engineering specifications . . . Grantor further agrees that the Permanent Access Road shall not contain speed bumps unless Orange County mandates that they are required, in which event Grantor shall install only such speed bumps as are required by Orange County. . . .
6. Prior to the completion of the apartment development on Grantor's Parcel, the general description of the Permanent Access Road set forth on the Site Plan shall be replaced with a metes and bounds legal description to reflect the actual location of the Permanent Access Road. . . .
(Emphasis added). The agreement also provided that Sand Lake Joint Ventures would install an electronic gate between the permanent access road and the Ogilvies' property ("rear gate"), which could be *122 opened by entering a code into a key pad or by portable automatic door openers. However, the provision in the easement discussing the rear gate included no language to indicate whether this was the only gate that the parties intended to permit.
At the hearing, Mr. Ogilvie acknowledged that the easement agreement does not expressly prohibit the installation of a gate or expressly state that the easement must remain "open." In coming to its conclusion that the gate was nevertheless prohibited, the trial court's order said:
2. The Easement Agreement is clear on its face, that the Petitioners reserved to themselves an easement without speed bumps, and one constructed in accordance with Exhibit C to the easement; that is, the site plan and the site plan does not have a gate.
. . . .
7. While erection of a gate that remains open does not violate the terms of the Easement Agreement, the closing of the gate does infringe on the Easement Agreement.
8. Respondents argue that the Court should balance or weigh the alleged infringement against the property owners' rights and offered evidence to support their position that the gate would not unreasonably interfere with the Petitioners' right of passage, or otherwise inconvenience the Petitioners. The Court is not required to, and thus did not, weigh the extent of convenience or inconvenience to the Petitioners. It is sufficient that the Petitioners object to the gate.
Sandlake argues that the trial court erred in interpreting the easement agreement to mean that the Ogilvies had the right to have the permanent access road constructed according to the preliminary site plan, which did not include a gate, because the purpose for attachment of the preliminary site plan to the agreement was only to show the approximate location and dimensions of the as yet unbuilt permanent access road and the concrete block wall. Review of the easement agreement and the site plan confirm that the trial court erred in concluding that the Ogilvies had the right under the agreement to an easement constructed exactly as shown on the site plan. The easement clearly specifies that the preliminary site plan was just thatpreliminary, and that the purpose for which it was incorporated was to "[reflect] the approximate location of the Permanent Access Road and the Concrete Block Wall."
Given our conclusion concerning the agreement, in order for the Ogilvies to have demonstrated a substantial likelihood of success on the merits, they would have had to have shown that the gate unreasonably interfered with their rights as easement holders, an issue the trial court expressly declined to address. Sandlake asserts that the "gate does not unreasonably interfere with the Ogilvies' right of ingress or egress" for several reasons. The gate, which can be opened from a distance by a remote opener, a cell phone, a call to the Association's office, or a drive-up access code is unlike a padlocked gate, which requires persons to exit their vehicles, unlock a padlock, then manually open the gate, drive through the gate, again exit the vehicle and close and lock the gate. The additional gate would not materially increase the burden in admitting guests and other invitees because there is already a gate at the entrance to the Ogilvies' property, and the Ogilvies can simply give them the access code for that gate, as they currently do for the *123 gate adjacent to their property. Also, testimony from Sandlake's expert and Mr. Ogilvie showed that traffic backups attributable to delays arising from the gate were minimal. We cannot, therefore, say that the trial court's decision to grant the temporary injunction was correct for other record reasons. Accordingly, we vacate the injunction and remand for further proceedings.
REVERSED and REMANDED.
PALMER and EVANDER, JJ., concur.
NOTES
[1] Sand Lake Joint Ventures built an apartment complex on the property.
[2] The Ogilvies were among a group of several homeowners named as grantees of the easement under the easement agreement.
[3] After Sand Lake Joint Ventures installed the gate, ownership of the gate passed to the grantees under the terms of the easement.
[4] The Complaint and Amended Complaint in this case were filed against the Sand Lake Private Residences Condominium Association, Inc. The trial court granted Sandlake Residences, LLC's motion to intervene in the suit and joined it as an additional party.
[5] A bascule bridge is "an apparatus or structure (as a drawbridge) in which one end is counterbalanced by the other on the principle of the seesaw or by weights." WEBSTER'S NINTH NEW COLLEGIATE DICTIONARY 133 (1989).