*632
 
 PER CURIAM.
 

 Following a nonjury trial, L
 
 &
 
 H Construction Company, Inc. (“L & H”) appeals a final judgment in favor of Circle Red-mont, Inc. (“Redmont”). We reverse.
 

 The construction contract at issue involved the renovation of the Thomas Edison historic site in West Orange, New Jersey, on behalf of the National Park Service (“NPS”). L & H was the general contractor and contracted with Redmont to manufacture a cast-iron staircase and a plank glass flooring system. The negotiations between L & H and Redmont transpired over several months. The primary contact with Redmont was Mary Louise Pace, the daughter of Redmont’s president.
 
 [1]
 
 Ms. Pace initially issued two separate proposals to manufacture the cast-iron staircase and the glass flooring system; both provided that Redmont would “engineer, fabricate and install” the staircase and flooring system. Attached to the proposals as Exhibit A was the progress payment milestone schedule. One of the milestones, triggering a progress payment, was “Completion of Installation.” In response to L & H’s request for a lower price, Ms. Pace revised the initial proposals, deleting the stair stringers and the installation costs. Both proposals now provided that Redmont would “engineer and fabricate” the staircase and flooring system, but omitted any reference to installation. The revised progress payment milestone exhibit reflected this change by requiring a payment upon “Supervision of Installation,” instead of “Completion of Installation.”
 

 L & H requested Redmont to combine the proposals into a single document, and to include the stair stringers and installation costs. Ms. Pace complied, and the agreement now reflected that Redmont would “engineer, fabricate and install” the staircase and flooring system. However, the progress payment milestone attachment continued to reflect a payment due upon supervision, rather than completion, of installation. Redmont subsequently issued a final revised proposal, which did not alter any of the terms of the prior proposal, but merely scheduled the payments to the end of the project so that L & H could fund the payments with monies received from NPS. According to the final proposal, the total contract price was $268,200 and was payable pursuant to the terms of Schedule “A” as follows:
 

 Due with Signing of Contract $ 5,000
 

 Due upon Completion of Shop Drawings $ 15,000
 

 Due upon Metal Frameworks/Molds $ 15,000
 

 Due upon Glazing $ 80,000
 

 Due upon Delivery $113,200
 

 Due upon Supervision of Installation (Hand delivered to Installation Supervisor) $ 40,000
 

 Total $268,200
 

 In response, L & H sent Redmont its standard subcontract. In the subcontract, L & H incorporated the scope of work and progress payment milestones from the final proposal, dated February 26, 2004. The L & H subcontract called for Red-mont to engineer, fabricate and install the staircase and flooring system, and the final payment milestone was “Due upon Completion.” It further provided for “the provision and installation of all stair stringers, stairtreads, risers and landing complete as per plans, specifications and all governing addenda.” At first, Redmont advised L & H that it was not its practice to sign its customers’ contracts or purchase orders. Notwithstanding this “policy,” Ms. Pace signed and returned the subcontract to L & H with a handwritten notation stating: “Conditionally accepted in accordance with terms and conditions of Circle Redmont, Inc.’s proposal/order ... all terms and
 
 *633
 
 conditions contrary thereto or not included therein are expressly rejected.” This handwritten notation was penned by Red-mont’s Chief Financial Officer/Office Manager, the wife of Redmont’s president.
 

 Without referencing the handwritten notation, L & H informed Redmont that it was in receipt of the subcontract and enclosed a $5,000 check so that Redmont could begin performance. Despite the slow and arduous progress of the shop drawing approval, which was primarily due to issues with NPS’s architects and structural engineers, L & H met the payment schedule as the work progressed, until the issue of installation came to the forefront. Redmont took the position that although the final February 26, 2004, proposal stated it would “engineer, fabricate and install” the staircase and flooring system, the inclusion of installation was in error. Relying on the language in the progress payment schedule, “Due Upon Supervision of Installation,” and the price reduction reflected in the final proposal, Redmont claimed Ms. Pace had made a mistake in preparing the final proposal,
 
 [2]
 
 but acknowledged that it never informed L & H of this mistake. Not surprisingly, L & H believed installation was included based on the phrase “engineer, fabricate and install” stated twice in the final proposal that Red-mont had prepared and the language found in the signed subcontract that it had prepared. At this point, a stalemate ensued.
 

 Redmont would not ship the product, but claimed that it did not refuse to ship, permit inspection, or supervise the installation of the staircase and flooring system. Rather, Redmont scheduled an inspection, and asked L & H to bring the outstanding payment. However, the record is silent as to the specific amount demanded. L & H contended that Redmont refused to ship the materials or honor its contractual obligations unless L & H made full payment under the contract. At trial, L & H was prevented from explaining how the specific demands that Redmont made exceeded the contract terms. The testimony from Red-mont on this critical issue was vague, but it acknowledged that it might have demanded more than just the milestone payment. As a result, L & H did not attend the inspection and refused to make the remaining payments. L & H maintained, however, that it was willing to go forward, notwithstanding the dispute, but needed to inspect the product before it made payment and took delivery. It is undisputed that Redmont never invoiced for glazing, one of the milestone events under the payment schedule, or for any further payments, which were required in order to pass the costs to NPS for reimbursement. Thereafter, the matter was turned over to the parties’ attorneys to resolve.
 

 While the litigation was pending, NPS terminated its contract with L
 
 &
 
 H. Red-mont began working directly with NPS and ultimately sold it the staircase and flooring system for $281,400, from which $200,500 was subtracted as the balance due from L & H. The $80,900 difference consisted of extras not included in the L & H subcontract. This left a difference of $32,700 from the amount of the original contract. The process of negotiating directly with NPS began almost immediately with the termination of L & H, but the procedure was protracted, in part, because NPS was not ready for the installation of the staircase and flooring system.
 

 At the conclusion of the nonjury trial, the trial court made a series of findings. It determined that the final Red-
 
 *634
 
 mont proposal of February 26, 2004, constituted the governing agreement. We find no error in that determination. The existence of a valid contract is a threshold question of law for the trial court.
 
 See Acumen Constr., Inc. v. Neher,
 
 616 So.2d 98, 99 (Fla. 2d DCA 1993);
 
 Altman Cooling Corp. v. Fla. Heat & Power, Inc.,
 
 305 So.2d 225, 226 (Fla. 4th DCA 1974). A valid contract arises when the parties’ assent is manifested through written or spoken words, or “inferred in whole or in part from the parties’ conduct.”
 
 Commerce P’ship 8098 Ltd. P’ship v. Equity Contracting Co.,
 
 695 So.2d 383, 385 (Fla. 4th DCA 1997). While L & H did not sign the February 26, 2004, final proposal, it clearly accepted the final proposal by its actions, i.e., paying the initial $5,000 deposit and the two subsequently invoiced $15,000 payments.
 
 [3]
 

 The trial judge also found that the word “install” in the phrase “engineer, fabricate and install,” was the result of a mutual mistake or scrivener’s error and that the parties intended the final contract provide for supervision, rather than hands-on installation of the system. L & H argues that this finding fails as a matter of law because there was no ambiguity in the document and no basis to resort to parol or extrinsic evidence to vary the terms of the contract. It further asserts that it is clear that the mistake, if any, was unilateral.
 

 First, while courts are without power to make or rewrite contracts for the parties, they do have the power to interpret them.
 
 Haenal v. U.S. Fidelity & Guar. Co.,
 
 88 So.2d 888, 890 (Fla.1956). It is well-established that the parties’ intent governs contract construction and interpretation.
 
 Whitley v. Royal Trails Prop. Owners’ Ass’n,
 
 910 So.2d 381, 383 (Fla. 5th DCA 2005);
 
 Royal Oak Landing Homeowner’s Ass’n, Inc. v. Pelletier,
 
 620 So.2d 786, 788 (Fla. 4th DCA 1993). To ascertain the intent of the parties to a contract, the trial court must examine the whole instrument, not isolated parts.
 
 Blackshear Mfg. Co. v. Fralick,
 
 88 Fla. 589, 102 So. 753, 754 (1925);
 
 Maines v. Davis,
 
 491 So.2d 1233, 1234 (Fla. 1st DCA 1986);
 
 Macaw v. Gross,
 
 452 So.2d 1126, 1127 (Fla. 3d DCA 1984). In the event an agreement is ambiguous, the court should follow a construction that best comports with logic, reason, and the purposes underlying the parties’ agreement.
 
 See Blackshear Mfg. Co.,
 
 102 So. at 754;
 
 Paneson v. Paneson,
 
 723 So.2d 385, 386 (Fla. 2d DCA 1999);
 
 Biltmore Sys., Inc. v. Mai Kai, Inc.,
 
 413 So.2d 458, 459 (Fla. 4th DCA 1982);
 
 Gold Coast Media, Inc. v. Meltzer,
 
 751 So.2d 645, 646 (Fla. 3d DCA 1999). The parties’ conduct through their course of dealings is also considered in determining the meaning of the written agreement.
 
 Blackhawk Heating & Plumbing Co., v. Data Lease Fin. Corp.,
 
 302 So.2d 404, 407 (Fla.1974).
 

 “A mistake is mutual when the parties agree to one thing and then, due to either a scrivener’s error or inadvertence, express something different in the written instrument.”
 
 Providence Square Ass’n, Inc. v. Biancardi,
 
 507 So.2d 1366, 1372 (Fla.1987). Parol evidence is admissible to show that the true intent of the parties was something other than that expressed in the written instrument.
 
 Id.
 
 at 1371.
 
 *635
 
 However, due to the strong presumption that a written agreement accurately expresses the parties’ intent, the party seeking reformation based on a mutual mistake must prove its case by clear and convincing evidence.
 
 BrandsMart U.S.A. of West Palm Beach, Inc. v. DR Lakes, Inc.,
 
 901 So.2d 1004, 1006 (Fla. 4th DCA 2005).
 

 Clearly, the final contract between L & H and Redmont was ambiguous. While the final February 26, 2004, proposal stated that Redmont was to “engineer, fabricate and install” the staircase and flooring system, Exhibit A to the proposal states that the final $40,000 progress payment was “Due upon Supervision of Installation.” The trial court allowed the parties to present some parol evidence to establish the parties’ true intent and subsequently found the contract contained a mutual mistake as to whether Redmont was to install, or merely supervise, the installation of the product. This was an issue that could have been decided for or against either party and we cannot say the trial court’s findings of fact were unsupported by competent, substantial evidence. Although the face of the contract clearly reflected a duty to install, Redmont’s witnesses’ testimony supported the trial court’s finding that it was the express understanding between Redmont and L & H that Redmont would only supervise, and not provide complete installation of the staircase and flooring system.
 

 Redmont’s witnesses testified that L & H knew that installation was being deleted as a means of saving money for L & H. Redmont’s installation supervisor testified that the final February 26, 2004, proposal was specifically worked up to schedule the progress payments toward the end of the job pursuant to L & H’s president’s request, and that L
 
 &
 
 H had decided that it wanted only installation supervision, and the contract price reflected installation supervision, not complete installation. Red-mont’s CFO/office manager further testified that L & H was aware that Redmont was not going to install the product “[b]e-cause [L & H’s president] had asked us to take the installation out to save money.” Moreover, Redmont’s president testified that he spoke directly with L & H’s president regarding Redmont’s supervision of installation and it was decided that Red-mont would only provide installation supervision. He testified that after Redmont had initially
 

 priced it with installation and then [L & H’s president] wanted to save money and what we did, we backed out installation, and you can see from the documents that the price consideration was given, and so we didn’t install it. And I had discussions with him that he had people on site anyway, iron workers that certainly could install it.
 

 Redmont’s president also reiterated that he had direct conversations with [L
 
 &
 
 H’s president] where he said, “Fred, how can we save me some money here and what can we do[.]” The weight to be given to the testimony turned on the witnesses’ credibility, a matter exclusively within the trial court’s province.
 
 BrandsMart,
 
 901 So.2d at 1006.
 

 That said, the judgment entered by the trial court is internally inconsistent. In the final judgment, the trial court found the payment for glazing was not invoiced and that L & H did not fail to pay any amounts invoiced prior to May 2006. However, it then found, without explanation, that L & H breached the contract in May 2006. Neither the trial court’s findings nor a review of the record reflect any conduct by L & H that constituted a breach at that point. We are hampered in reviewing the record because the trial court sustained Redmont’s objections and did not allow any evidence with regard to
 
 *636
 
 what transpired following the impasse on the installation issue, finding that this evidence constituted settlement negotiations, represented attorney-client communications, or was irrelevant.
 

 The record does not establish the basis of a breach of contract. Demands were made for payment of monies never invoiced and Redmont’s president was unable to articulate the precise amount due and owing and whether other conditions, such as a release, were required before inspection and/or shipping would occur. Despite this, at trial, Redmont argued the date of default was established by contract provisions, which state:
 

 If seller is prevented from proceeding with fabrication or delivery due to delays in performance by the customer or conditions of the building, all additional payments, including payments which would be due on delivery, shall be paid no later than one year from submittal of the original shop drawings.
 

 The trial court made no findings, and the record does not reflect, that any delay was occasioned by L & H’s conduct. Rather, it is clear that a bona fide dispute arose over installation. The trial court, accepting Redmont’s position at trial, disallowed evidence of what transpired after the dispute arose, resulting in insufficient evidence to support the trial court’s final judgment. Therefore, we reverse the final judgment finding L & H to be in breach of contract.
 

 REVERSED.
 

 EVANDER and COHEN, JJ., and FLEMING, J., Associate Judge, concur.
 

 [1]
 

 . Redmont is a family-operated company.
 

 [2]
 

 . Interestingly, Ms. Pace was not called to testify and L & H's attempts to serve her for trial were frustrated by her absence from the state.
 

 [3]
 

 . In its answer to Redmont’s counterclaim, L & H admitted that a "true and accurate copy of the L & H — Circle Redmont contract, (Red-mont’s proposal) is attached to L & H’s Complaint as Exhibit 'A'." Additionally, L & H pled that pursuant to the contract, the parties had agreed venue was proper in Brevard County. That venue provision was contained in Redmont’s final proposal, contrary to the New Jersey venue provision found in L & H's proposed subcontract.