BENTON, C.J.
 

 When Craigside, LLC (Craigside) sued GDC View, LLC (GDC), a developer in Walton County, for the return of moneys paid under a preconstruction contract for the purchase of a condominium, the trial court ruled that GDC had not breached the contract, and entered judgment accordingly. We reverse in part and remand, with directions that the trial court award Craigside interest on $900,000 at the statutory rate, from April 16, 2007, until the date GDC repaid Craigside $900,000, but otherwise affirm the judgment.
 

 On September 2, 2004, Craigside contracted to purchase a waterfront condominium (unit 1950) from GDC for $1,125,000. Craigside paid the entire purchase price before construction began, depositing $225,000 with an escrow agent upon execution of the agreement, and remitting the balance of $900,000 in November of 2004. The contract required GDC “to complete the condominium unit ... within two (2) years of the date of this Agreement but in no event later than May 1, 2007,” allowing extensions only for “delays caused by events which would support a defense based on impossibility of performance for reasons beyond [GDC’s] control.” The contract contained detailed provisions regarding the closing date,
 
 [1]
 
 and the consequences of any failure to close on time.
 
 [2]
 

 
 *1089
 
 On April 16, 2007, Craigside sent GDC’s lawyer a letter, asserting GDC had failed to complete the condominium unit by the deadline, and saying: “Recently a letter was sent out by your office indicating that closing is anticipated on May 1, 2007. This is unacceptable to Craigside LLC. Please consider this letter as notice to your client that Craigside LLC considers GDC View, LLC in breach of the contract and further demands a return of all funds submitted ... with interest.” After GDC refused to accede to this demand, Craig-side filed the complaint that began the present litigation, alleging GDC was in breach because it had failed to complete the condominium unit on time and had refused to return the moneys Craigside had paid, with interest.
 

 At the ensuing bench trial, the main issue was the number of delay days to which GDC was entitled. The trial court ruled that GDC was entitled to at least 258 delay days, and that the unit was timely completed on April 23, 2007, in any event. Trial evidence also showed that GDC had sold the unit to a third party in July of 2008, and had subsequently (on August 26, 2008) returned $900,000 to Craigside, but had declined to refund the $225,000 initial deposit or to pay interest in any amount. Determining that GDC acted in accordance with the agreement when it sold the unit—because, the trial court reasoned, Craigside “fail[ed] to come to the ... closing[ ]”
 
 [3]
 
 —the trial court concluded that GDC did not breach the agreement, and entered final judgment in favor of GDC on February 9, 2010.
 

 While the parties are entitled to
 
 de novo
 
 review of the trial court’s rulings with respect to the legal effect of the contract, we are bound by the trial court’s findings of fact in a case, like the present one, where competent, substantial evidence supports the findings.
 
 See Zupnik, Haverland, L.L.C. v. Current Builders of Fla., Inc.,
 
 7 So.3d 1132, 1134 (Fla. 4th DCA 2009) (“The lower court’s ultimate factual determinations during a non-jury trial may not be disturbed on appeal unless shown to be unsupported by competent and substantial evidence or to constitute an abuse of discretion.” (citation omitted));
 
 Imagine Ins. Co., Ltd. v. State ex rel. Dep’t of Fin. Servs.,
 
 999 So.2d 693, 696 (Fla. 1st DCA 2008) (noting that a trial court’s interpretation of a contract is a matter of law subject to
 
 de novo
 
 review).
 

 Craigside argues that its not showing up for the closing was not a default,
 
 *1090
 
 because GDC never gave Craigside the required notice of closing date; and that it was GDC who breached by selling the condominium unit to somebody else, without providing Craigside prior notice of termination as required by paragraph 6(A). In its April 16, 2007 letter, however, Craig-side unequivocally informed GDC that Craigside was not going to close on unit 1950. In doing so, Craigside communicated an anticipatory repudiation which breached the agreement.
 

 In dealing with anticipatory repudiations the law is clear that a repudiation gives rise to a claim for damages by the nonbreaching party. As stated in Restatement (Second) of Contracts § 253 (1979):
 

 (1) Where an obligor repudiates a duty before he has committed a breach by non-performance and before he has received all of the agreed exchange for it, his repudiation alone gives rise to a claim for damages for total breach.
 

 (2) Where performances are to be exchanged under an exchange of promises, one party’s repudiation of a duty to render performance discharges the other party’s remaining duties to render performance.
 

 Therefore, the nonbreaching party is relieved of its duty to tender performance and has an immediate cause of action against the breaching party.
 
 Poinsettia Dairy Products, Inc. v. Wessel Co.,
 
 123 Fla. 120, 166 So. 306 (Fla.1936). This alone, however, does not entitle the non-breaching party to damages. Anticipatory repudiation obviates the requirement that the conditions be performed, but not that they be performable.
 

 As stated in the Restatement (Second) of Contracts § 254 (1979):
 

 (1) A party’s duty to pay damages for total breach by repudiation is discharged if it appears after the breach that there would have been a total failure by the injured party to perform his return promise....
 

 ... The holder of the duty based upon a condition precedent cannot profit from an anticipatory repudiation of a contract that he would have breached himself. It follows that if performance of the conditions precedent is excused the ability to perform them must still be shown.
 

 Hasp. Mortg. Grp. v. First Prudential Dev. Corp.,
 
 411 So.2d 181, 182-83 (Fla.1982).
 
 See also Jones v. Warmack,
 
 967 So.2d 400, 402 (Fla. 1st DCA 2007) (“If one party to an agreement has breached the agreement, the other party’s failure to continue with the agreement is not considered a default of the contract.”).
 

 Craigside’s letter terminated the agreement prior to the occurrence of any default by Craigside (which would have entitled GDC to declare a default) at a time when GDC could have performed if Craigside had not breached. GDC had no obligation therefore to give notice that it considered Craigside to be in default.
 
 See Picard v. Burroughs,
 
 304 So.2d 455, 456 (Fla. 1st DCA 1974) (“In order to successfully invoke a forfeiture provision in a contract for the sale and purchase of real estate, the party seeking the forfeiture must (in the absence of a specific provision in the contract to the contrary) first prove strict compliance with those provisions of the contract required to be complied with by the party seeking the forfeiture, or else prove that such compliance has been either excused or prevented by the party against whom the forfeiture is sought.”).
 
 See also Realty Sec. Corp. v. Johnson,
 
 93 Fla. 46, 111 So. 532, 535 (1927) (“Nor is any notice [of forfeiture] necessary where the vendee has actually abandoned the contract, or has so acted as to create a reasonable
 
 *1091
 
 belief on the part of the vendor that the vendee has abandoned the contract.”).
 

 If GDC had formally given notice that it was electing under paragraph 6(A) to retain the $225,000 deposit, Craigside could have done nothing to alter that result. By then, Craigside’s anticipatory repudiation put it in breach. “[W]here one party, even before the time for performance of the contract has arrived, renounces it to the other party, the latter may act on the renunciation, [and] treat the contract as broken.”
 
 Sullivan v. McMillan,
 
 26 Fla. 543, 8 So. 450, 457 (1890).
 
 See also Realty Securities Corp.,
 
 111 So. at 535 (“ ‘A formal notice by the vendor may not, perhaps, be always necessary, for it is declared in some decisions, that any act of the vendor, of which the purchaser is, or must, in the nature of things, be informed—showing clearly and unequivocally that the vendor has elected to rescind the agreement, or to treat it as at an end—will operate the same as and take the place of a notice of such intention to the vendee; but the act, in order to produce this effect, must be wholly inconsistent with a continuance of the contract.’ ” (quot
 
 ing Pomeroy’s Spec. Perf.
 
 § 893 (3d Ed.))). “It is unquestionably the law that a vendee may waive the right to such a notice.”
 
 Id.
 
 (citation omitted).
 
 [4]
 

 Craigside, in its complaint filed on May 8, 2007, sought return of all moneys paid under the agreement, with interest. The parties’ agreement provided for a “Deposit” of $225,000 upon execution of the agreement, and for an “Additional Deposit” of $900,000 by October 1, 2004. In the event of a breach, Paragraph 6(A) entitled GDC to retain Craigside’s “deposit” (singular) as liquidated damages. GDC was entitled to retain the $225,000 Craig-side deposited at the time it executed the agreement, but not the $900,000 Craigside later paid.
 
 [5]
 
 GDC acknowledged as much in returning the $900,000 to Craigside on August 26, 2008.
 

 But GDC never paid Craigside any interest on the $900,000. “ ‘In all cases, either of tort or contract,
 
 where the loss is wholly pecuniary,
 
 and may be fixed as of a definite time, interest should be allowed as a matter of right, whether the loss is liquidated or unliquidated.... [T]he plaintiff
 
 *1092
 
 will not be fully compensated unless he receive, not only the value of what he has lost, but receive it as nearly as may be as of the date of his loss.’ ”
 
 Bosem v. Musa Holdings, Inc.,
 
 46 So.3d 42, 46 (Fla.2010) (quoting William B. Hale,
 
 The Law of Damages,
 
 § 67 (2d ed.1912)). Craigside was entitled under the agreement, not only to return of the $900,000, but also to interest on that sum.
 

 Craigside was entitled to return of the $900,000 as of the date of GDC’s election to retain the deposit as liquidated damages. While GDC gave no formal notice of its election, GDC was entitled to elect and must be deemed to have elected to retain the $225,000 as liquidated damages on April 16, 2007, the date Craigside repudiated the contract. At no time has GDC sought specific performance or any remedy other than retention of Craigside’s $225,000 deposit as liquidated damages.
 
 See
 
 25 Richard A. Lord,
 
 Williston on Contracts
 
 § 66:112 at 145-47 (4th ed.2002) (“Generally, interest awarded as damages in a contract action runs from the date when the right to recover on the claim became vested or accrued, which is ordinarily the date of the breach or the date when payment was due under the contract.” (footnotes omitted)).
 

 Under accepted principles, interest began running on the $900,000 from the date on which GDC was obligated to return the money.
 
 See Am. Linens, Inc. v. Venmall Int’l Grp.,
 
 645 So.2d 1059, 1060 (Fla. 3d DCA 1994) (holding that demand for return of deposit was a liquidated contractual claim which became due when the defendant demanded the return of its deposit, and the defendant was entitled to interest on its deposit claim);
 
 Chadwick v. Corbin,
 
 476 So.2d 1366, 1368 (Fla. 1st DCA 1985) (“In contract actions, it is proper to allow interest from the date the debt was due rather than from judgment. However, the rule presupposes an exact amount due and a date from which interest can be computed.” (citing
 
 Bryan & Sons Corp. v. Klefstad,
 
 265 So.2d 382, 385 (Fla. 4th DCA 1972)));
 
 U.S. Home Corp. v. Suncoast Utils., Inc.,
 
 454 So.2d 601, 606 (Fla. 2d DCA 1984) (“[Ojnce it is determined a contract debt is due, prejudgment interest may be awarded.” (citing
 
 Parker v. Brinson Constr. Co.,
 
 78 So.2d 873, 874 (Fla.1955))).
 

 Accordingly, we reverse in part and remand with directions that the trial court amend its final judgment to award Craig-side interest on $900,000 at the rate prescribed by section 55.03, Florida Statutes (2010), for the period from April 16, 2007, to August 26, 2008. The judgment is otherwise affirmed.
 

 DAVIS and THOMAS, JJ., concur.
 

 [1]
 

 . The agreement provided, in part:
 

 4.
 
 COMPLETION, CLOSING DATE AND OCCUPANCY.
 

 B)
 
 Closing Date.
 
 Closing shall be held on a date and at such place as shall be specified in a written notice given by Developer to Purchaser in the manner hereinafter provided for the giving of notice, provided that such notice shall be given not less than ten (10) days prior to the designated closing date....
 

 (1) If, upon substantial completion of construction and notice to Purchaser by Developer as provided in this Agreement, Purchaser fails to close in a timely manner, then and in that event, interest shall be payable to Developer in addition to the purchase price.... Should Purchaser fail to close within twenty (20) days after the date of closing specified in the notice given, then the deposit(s) paid by the Purchaser, together with all interest earned on said deposit, may be retained by or for the account of and in full settlement of any claims of Developer, and Developer may contract to sell the unit to another purchaser; whereupon all parties shall be relieved of all obligations under this Agreement; or Developer, at its option, may pursue all default remedies available under the law or under the terms of this Agreement.
 

 [2]
 

 . The agreement provided, in part:
 

 6.
 
 DEFAULT.
 

 A.
 
 By Purchaser.
 
 Should Purchaser fail to close this transaction as provided herein, or to perform any of Purchaser’s other obligations hereunder, time being of the essence of this Agreement, Developer may, at Developer’s option, either (i) terminate this Agreement by notice to Purchaser, whereupon Purchaser's deposit (including any interest earned thereon) shall be paid to Developer as liquidated, agreed damages (and not as a penalty) for Purchaser's default, (ii) seek other remedies, if Developer is entitled to such remedies by operation of law, or (iii) seek specific performance of Purchaser’s obligations under this Agreement.
 

 B.
 
 By Developer.
 
 Should Developer fail to close this transaction as provided above or to perform any of Developer’s other obligations hereunder, time being of the essence of this Agreement, Purchaser may, at Purchaser’s option, either (i) terminate this Agreement by notice to Developer, whereupon Purchaser’s deposit (including any interest earned there
 
 *1089
 
 on) shall be returned to Purchaser, (ii) seek other remedies if Purchaser is entitled to said remedies by operation of law, or (iii) seek specific performance of Developer’s obligations under this Agreement.
 

 [3]
 

 . Craigside asserts that the trial court’s finding that Craigside triggered paragraph 4(B)(1) of the agreement by failing to come to the closing on the condominium unit is not supported by competent, substantial evidence, and we agree: GDC did not provide Craigside with notice specifying a closing date. But, when Craigside informed GDC on April 16, 2007, that it refused to go through with the sale, GDC was no longer under any duty to schedule the closing.
 
 See Peachtree Cas. Ins. Co. v. Walden,
 
 759 So.2d 7, 8 (Fla. 5th DCA 2000) (" ‘It is now the generally prevailing rule in both England and the United States that a definite and unconditional repudiation of the contract by a party thereto, communicated to the other, is a breach of the contract, creating an immediate right of action and other legal effects, even though it takes place long before the time prescribed for the promised performance and before conditions specified in the promise have ever occurred.' ” (quoting Arthur Corbin,
 
 Corbin on Contracts
 
 § 959 (1951))). ”[I]f a trial court reaches the right result, but for the wrong reasons, it will be upheld if there is any basis which would support the judgment in the record.”
 
 Dade Cnty. Sch. Bd. v. Radio Station WQBA,
 
 731 So.2d 638, 644 (Fla.1999).
 

 [4]
 

 . The record on appeal suggests that Craig-side had actual notice that GDC elected to terminate the agreement and retain the deposit as liquidated damages early on. Brad Berman, vice-president of GDC, testified that he called Brett Person, the managing member of Craigside, sometime after May 1, 2007, and indicated GDC had a potential purchaser for the unit. Mr. Person testified that Mr. Ber-man called him at some point after Craigside had filed the lawsuit and asked that Craig-side's real estate agent stop listing unit 1950. Although a repudiation can be retracted before the injured party changes position in reliance on the repudiation, if the injured party disregards the repudiation and treats the contract as still in force,
 
 see
 
 23 Richard A. Lord,
 
 Williston on Contracts
 
 § 63:57 at 670-71 (4th ed.2002), Craigside does not assert that it desired or attempted to retract its repudiation prior to GDC's sale of the unit.
 

 [5]
 

 . This sum was held under a special "escrow” provision which authorized GDC to make full use of the funds in constructing the condominium property:
 

 2.
 
 ESCROW. ....
 

 (A) Any deposit payment in excess of 10% of the sales price of a unit which is received prior to completion of construction by the Developer shall be deposited and held in a special escrow account by the Escrow agent and, pursuant to the terms of the Escrow Agreement, the Escrow Agent may, when the construction of improvements has begun, disburse funds for use in the actual construction and development of the condominium property in which the unit which is the subject of this Purchase Agreement is located. No part of such deposit may be used for salaries, commissions, or expenses of salesmen or for advertising purposes.