McCUNE, R.J., Associate Judge.
This case is about a certain easement and access to the beach. Appellants, Gary D. Condron and Nancy K. Condron (“Con-drons”), appeal the trial court’s final judgment,- which construed a description of an easement upon the Condrons’ property as being coterminous with the actual dimensions of the easement at issue, rather than “merely descriptive” of the area over which the Appellees (“Benefitted Owners”) had a right of ingress and egress. On cross-appeal, two of the Benefitted Owners — James R. Stockton IV and Robert W. Stockton (“Stocktons”) — appeal the final judgment to the extent that the trial court’s ruling prohibited the Benefitted Owners from transporting horses across the easement. We affirm the trial court’s coterminous determination, but conclude that the lower court’s conclusion regarding the transportation of horses across the easement was not supported by competent, substantial evidence and, accordingly, reverse.
In December 1981, James R. Stockton Jr. executed a warranty deed conveying the “Stockton III Property” and the “Ocean Lot” to his son, James R. Stockton *53 III. In his deed, Stockton Jr. reserved a perpetual easement for ingress and egress over and across the easement area described as a “10 foot easement over and across a parcel of land” lying ten feet north of the southern boundary of the Ocean Lot.
In January 1982, Stockton Jr. conveyed the “Smith Property” to James and Catherine Smith. The warranty deed stated that the conveyance was subject to “all covenants, conditions, easements, restrictions and reservations of record.” On the same day, Stockton Jr. executed a “Grant of Non-Exclusive Easement” to the Smiths conveying an “easement for ingress and egress by foot or by vehicle over and upon a 10 foot easement over and across a parcel of land [located in the southerly ten feet of the Ocean Lot].”
In January 1983, Robert and Isabelle Davis purchased the Ocean Lot from Stockton III. In an effort to consolidate the original easement documents, the Stocktons, the Smiths, and the Davises executed an “Easement Agreement.” The agreement stated that as part of the consideration for the Ocean Lot, the other parties agreed to enter into the agreement for their mutual benefit. Importantly, Recital C of the Easement Agreement explained that “[t]he portion of the Ocean Lot burdened with the easement is the ‘Easement Area.’ ” The Easement Agreement also provided, in pertinent part:
Stockton Jr. does hereby unconditionally and irrevocably agree that from and after the date hereof his reserved nonexclusive easement over the Easement Area shall be appurtenant to and run with title to the Stockton Jr. Property, the Stockton III Property and the Smith Property, and to the extent legally necessary, Stockton Jr. does hereby convey to each of those owners non-exclusive easement rights for ingress and egress from their respective properties to the beach located to the east of the Ocean Lot over, upon, and across the Easement Area.
In June 1988, Stockton III purchased the property immediately south of the Ocean Lot (“Southerly Ocean Lot”). Several months later, the Davises purchased the Southerly Ocean Lot from Stockton III. At the time of this conveyance, the parties to the original Easement Agreement agreed to relocate the Easement Area in question to the southerly ten feet of the Southerly Ocean Lot pursuant to the “Amendment To Easement Agreement” executed by those parties. This was apparently done to avoid having the easement divide the two oceanfront lots acquired by the Davises. Importantly, the Amended Easement Agreement retained the original agreement’s definition of Easement Area and made clear that while the location of the Easement Area had changed, the parties’ rights and obligations under the original agreement had not.
In May 2004, the Condrons acquired the Southerly Ocean Lot from the Davises by warranty deed. At the time of the Con-drons’ acquisition, the Easement Area was a sandy footpath on an unimproved piece of oceanfront property. The Condrons began the construction of their home on the Southerly Ocean Lot in 2006. In 2008, they began making improvements to the Easement Area, which included: (1) building a four-foot wide boardwalk; (2) planting trees, shrubbery, and other vegetation; (3) installing a sprinkler/irrigation system; and (4) installing a front fence and gates. The Condrons actually installed two gates that blocked entry onto the easement. The “first gate” included a combination lock and opened to a width of approximately four feet across the wooden boardwalk. The Condrons provided each of the Bene- *54 fitted Owners with a key code to open this gate.
Although relations between the Con-drons and the Benefitted Owners were friendly immediately following the improvements, those relations soured by 201Q. In 2011, the Benefitted Owners filed their complaint for injunctive relief, asserting that the Condrons violated the Benefit-ted Owners’ rights under the Easement Agreement and Amended Easement Agreement by effectively reducing the width of the Easement Area from ten feet to approximately four feet, thereby impeding the Benefitted Owners’ ability to ingress and egress “over, upon and across” the Easement Area. The Benefitted Owners demanded the removal of the trees, shrubbery, gate and locking system, but not the boardwalk. In their amended answer, the Condrons included a counterclaim seeking a declaration that the Amended Easement Agreement did not permit use of the easement for commercial or non-pedestrian uses. The counterclaim alleged that one or more of the Benefitted Owners stated that they intended to use the easement to host beachfront weddings and gatherings for a fee and/or use the easement as a means for “transporting horses, boats and other non-pedestrian items to the beach.”
In March 2012, the Benefitted Owners filed a motion for partial summary judgment, requesting the trial court to adjudge that their easement across the Condrons’ property is ten feet in width. The trial court granted the motion and held that “the easement documents clearly establish that the ten foot area set aside for the easement and the right of ingress and egress are coterminous, i.e. the ten foot width is a description of the easements [sic ] dimensions.”
In September 2013, the trial court entered a final judgment granting injunctive relief to the Benefitted Owners and declaratory relief to the Condrons. In the judgment, the trial court reaffirmed its prior summary judgment ruling regarding the coterminous nature of the easement and the Easement Area. The trial court ordered that the sprinkler/irrigation system must be removed or relocated and that any watering of vegetation will not interfere with the Benefitted Owners’ use of the easement. The trial court also ordered the removal of any tree wholly within the Easement Area that has a trunk base six inches or wider. Any large trees partially within the Easement Area could remain but must be trimmed so that any branches did not hang lower than twelve feet above the ground or boardwalk. The trial court deemed de minimus other plants and trees located in the Easement Area and allowed them to remain in the easement.
The trial court also ruled in its final judgment upon the Condrons’ counterclaim. First, it noted that the parties stipulated at trial that any commercial use of the Easement Area was inconsistent with the terms of the easement documents. The trial court found that the easement documents did not contemplate the use of horses over the Easement Area and held that horses should be excluded. The trial court reasoned that no St. Johns County permit allowed for horses on the beach in the area of the easement and, therefore, it was irrelevant if horses could be on the easement at all. The trial court also ordered that any boats that could be carried by a pedestrian were allowed to be carried across the Easement Area.
The primary issue the Condrons raise on appeal concerns the trial court’s determination that the easement is coterminous with the ten-foot Easement Area. The Condrons argue that neither this court nor any other Florida appellate court “has ever adopted or endorsed an interpre *55 tation of the language ‘over* upon and across’ to mean that easement rights are automatically coterminous with the described area.” As the interpretation of an easement is purely a question of law, Florida Power Corp. v. Silver Lake Homeowners Ass’n, 727 So.2d 1149, 1150 (Fla. 5th DCA 1999), the applicable standard of review is de novo, see Whitley v. Royal Trails Prop. Owners’ Ass’n, 910 So.2d 381, 383 (Fla. 5th DCA 2005). A trial court’s factual findings are reviewed to determine if such findings are supported by competent, substantial evidence. Craigside, LLC v. GDC View, LLC, 74 So.3d 1087, 1089 (Fla. 1st DCA 2011). This court has previously explained the trial court’s role in interpreting documents creating an easement as follows:
[T]he rule is that “in reviewing the documents creating an easement, if the language is clear, concise, and unambiguous” effect must be given “to the terms as stated without resort to other rules of construction to ascertain their meaning.” However, if terms of the agreement are ambiguous, the court may consider extrinsic evidence in determining “the intent of the parties at the time the document establishing the easement was created.” The language of a provision is ambiguous when it is fairly interpreted as having more than one meaning.
Sandlake Residences, LLC v. Ogilvie, 951 So.2d 117, 119-20 (Fla. 5th DCA 2007) (citations omitted).
An express easement must be interpreted by looking at what the original parties and their successors in title intended, which is manifested by both the circumstances and the actions and statements of those parties. See Diefenderfer v. Forest Park Springs, 599 So.2d 1309, 1312-13 (Fla. 5th DCA 1992), (finding that deed language reserving “a perpetual nonexclusive easement for ingress and egress over and across the southerly fifty feet” of a parcel of property covered entire 50 foot area and was not merely descriptive of property which dominant tenement had right of ingress and egress sufficient to accommodate his actual needs, where record indicated original parties contemplated a full 50-foot roadway and servient owners previously attempted to purchase 30 feet of the easement from dominant owners); see also Sand Lake Shoppes Ltd. P’ship v. Sand Lake Courtyards, L.C., 816 So.2d 143, 146 (Fla. 5th DCA 2002) (holding that an easement “for the purpose of vehicular and pedestrian ingress and egress to and from Sand Lake Road over, across and upon all of that certain parcel of land” clearly indicated that the easement was dominant over entire parcel of property); Richardson v. Jackson, 667 So.2d 928, 929 (Fla. 5th DCA 1996) (concluding that language creating an easement for “access, ingress and egress and roadway purposes, over and across” a 25-foot area was unambiguous, thus entire area was coterminous with right of ingress and egress); Hoff v. Scott, 453 So.2d 224, 225-26 (Fla. 5th DCA 1984) (holding that an easement “over, across, and upon a strip of land 20 feet wide ... such strip of land to be used in common with the right of ingress and egress” unambiguously indicated that entire strip was set aside for ingress and egress). The threshold question in this case is whether the right of ingress and egress is coterminous with the area set aside for the easement. If the right is found to be coterminous, then there can be no encroachments into the easement area. See Sand Lake Shoppes, 816 So.2d at 146.
While an easement “over” a described area may typically refer to the description of the property over which the dominant owner has a right of ingress and egress,[1] there are other indicia present *56 that support the trial court’s conclusion that the easement is coterminous with the Easement Area. In particular, the inclusion of the additional terms “upon” and “across” unambiguously state that the easement is coterminous with the ten-foot wide Easement Area. These same additional terms were part of the easement description at issue in Hoff, where we found that the deed’s language regarding that easement was unambiguous and meant the entire strip of land was set aside for the dominant owner’s right of ingress and egress. See 453 So.2d at 225-26.[2] Moreover, paragraph nine of the Easement Agreement in the instant case states that it was the parties’ intent that the Easement Area “remain a private, perpetual and non-exclusive easement for the use and benefit of the [Benefitted Owners].” See Diefenderfer, 599 So.2d at 1312 (“[T]he proper construction of the grant must be arrived at by looking at what the original parties intended, as well as their successors in title as manifested by both the circumstances, and the actions and statements of the people involved.”). We therefore find the trial court did not err when it determined that the easement was coterminous with the Easement Area.[3]
On cross-appeal, the Stocktons challenge the trial court’s interpretation that the easement documents excluded the transportation of horses across the Easement Area. Although the Stocktons concede that the transportation of horses with a vehicle across the Easement Area is prohibited, they argue that the Benefitted Owners are not prohibited from walking or riding horses across the Easement Area.
The first aspect of the Stocktons’ cross-appeal concerns the trial court’s legal interpretation of the easement documents. The original Grant of Non-Exclusive Easement from Stockton Jr. in 1982 provided for “[a]n easement for ingress and egress by foot or by vehicle over and upon a 10 foot easement....” This grant was incorporated into the Easement . Agreement at issue in this case, but modified to the extent that any motorized vehicular ingress and egress was prohibited. Paragraph one of the Easement Agreement provided “non-exclusive easement rights for ingress and egress from their respective properties to the beach located to the east of the Ocean Lot over, upon and across the Easement Area.” Paragraph three also referred to the manner by which the Davises (now, the Condrons) must maintain the Easement Area. Per the Easement Agreement, “Davis, at his cost and expense, shall maintain the Easement Area in a manner which permits its use as a pedestrian path.” This maintenance provision further stated that Davis “shall keep natural vegetation within the Easement Area cut and trimmed in a manner which will permit Smith and the other benefited parties the right to traverse it by foot without unreasonable interference from *57 vegetation or other natural or artificial barriers.” The Easement Agreement and Amended Easement Agreement are silent as to animals traversing the Easement Area.
As we have previously explained, “the scope of an easement is defined by what is granted, not by what is excluded, and all rights not granted are retained by the grantor.” City of Orlando v. MSD-Mattie, LLC, 895 So.2d 1127, 1130 (Fla. 5th DCA 2005). When there has been a grant or reservation of an access easement made in general terms, the easement will ordinarily be construed as creating a general right of use for all reasonable purposes. Here, the Easement Agreement and Amended Easement Agreement provide the Benefitted Owners with a generalized right of ingress and egress. The only limitation placed upon the Benefitted Owners’ rights was that any vehicular or motorized ingress and egress were expressly prohibited. We find that the intent of the parties should govern in the instant case given the broad language of the easement documents. See L & H Const. Co. v. Circle Redmont, Inc., 55 So.3d 630, 634 (Fla. 5th DCA 2011) (holding that in order to ascertain the intent of parties to a contract, “the trial court' must examine the whole instrument, not just isolated parts”). There is ample record evidence that demonstrates the parties contemplated using the easement with horses. Stockton Jr. testified that when the Easement Area was created, it was not unusual for people to ride their horses to the beach in the Ponte Vedra area. Another one of the Benefitted Owners witnessed Stockton III and others regularly accessing the beach by riding their horses. Furthermore, Nancy Condron testified at trial that she changed her initial construction plans for the boardwalk so as to accommodate Stockton III and his continued desire to take horses down to the beach. Part of the improvements also included the Con-drons installing a “horse gate” with a padlock within the Easement Area.
Although the right of the Benefitted Owners to use a horse for ingress and egress to the beach is not expressly discussed in the easement documents, we hold that such use is reasonable under the generalized grant of easement. The use of the easement with horses for over 20 years prior to the commencement of the instant litigation supports the conclusion that such use was the intent of the original parties to the easement documents. We find that the references to a “pedestrian path” in paragraph three of the Easement Agreement should not be read to restrict the Benefitted Owners’ rights to use the Easement Area, but rather to describe the manner in which the Easement Area must be maintained.
Moreover, a review of the record indicates that the testimony of a St. Johns environmental coordinator does not support the trial court’s finding that there is “no St. Johns County permit which would allow horses on the beach in the area of the easement or access from this property.” The coordinator testified that anyone desiring to ride a horse on the beach in St. Johns County is required to apply for a permit with the county and that riding is permitted within certain areas. The Easement Area at issue is situated within one of those areas. As this testimony directly contradicts the trial court’s finding that no county permit would allow horses on the beach in the area where the easement was located, we find that the trial court’s factual finding on this point was also not supported by competent, substantial evidence. We note further that, while the environmental coordinator testified that the county has designated access points for horses to traverse onto the beach and does not *58 permit horses to be ridden in the dunes, there was no testimony that these public access points were the only entry points that could be used for a horse’s entry onto the beach. Riding along the dunes is different from riding through the dunes so as to access the beach by way of a private easement.
In conclusion, we affirm the trial court’s grant of relief by the final'judgment entered in this case except for that portion of the judgment, which declared that the Benefitted Owners may not transport horses across the Easement Area. As to that single point alone, we reverse the decision of the trial court and remand the case for entry of an order permitting the Benefitted Owners to transport horses by foot across the Easement Area.
AFFIRMED IN PART; REVERSED, in part; and REMANDED.
LAMBERT, J. and JACOBUS, B.W., Senior Judge, concur.

. See Diefenderfer, 599 So.2d at 1312.

. While the easement language in Hoff also included the additional phrase that the strip of land was to be "used in common for the right of ingress and egress," 453 So.2d at 225, Recital C of the Easement Agreement in this case expressly defined the easement as being one and the same with the Easement Area.

. The Condrons further argue that the trial court failed to address whether the improvements they made to the Easement Area "unreasonably interfered” with the Benefitted Owners’ rights of ingress and egress. The Condrons appear to derive this argument from the language contained in paragraph three of the Easement Agreement, which outlined the responsibilities to maintain the Easement Area “in a manner which permits its use as a pedestrian path.” We find, however, that it was not necessary for the trial court to analyze the reasonableness of the improvements installed by the Condrons once it determined that the easement was coterminous with the Easement Area.