[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 14-10644
_____

D.C. Docket No. 6:11-cv-00859-CEH-GJK

DUSTIN S. KOLODZIEJ,

                        Plaintiff - Appellant,

versus

JAMES CHENEY MASON,
J. CHENEY MASON, P.A.,

                        Defendants - Appellees.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(December 18, 2014)

Before WILSON and ROSENBAUM, Circuit Judges, and SCHLESINGER,[*]
District Judge.

WILSON, Circuit Judge:

_____

[*] Honorable Harvey E. Schlesinger, United States District Judge for the Middle District
of Florida, sitting by designation.

This case involves a law student's efforts to form a contract by accepting a "million-dollar challenge" that a lawyer extended on national television while representing a client accused of murder. Since we find that the challenge did not give rise to an enforceable unilateral contract, we hold that the district court properly entered summary judgment for the lawyer and his law firm, Defendants-Appellees James Cheney Mason (Mason) and J. Cheney Mason, P.A., with regard to the breach-of-contract claim brought by the law student, Plaintiff-Appellant Dustin S. Kolodziej.

## I.

The current dispute—whether Mason formed a unilateral contract with Kolodziej—arose from comments Mason made while representing criminal defendant Nelson Serrano, who stood accused of murdering his former business partner as well as the son, daughter, and son-in-law of a third business partner. During Serrano's highly publicized capital murder trial, Mason participated in an interview with NBC News in which he focused on the seeming implausibility of the prosecution's theory of the case. Indeed, his client ostensibly had an alibi—on the day of the murders, Serrano claimed to be on a business trip in an entirely different state, several hundred miles away from the scene of the crimes in central Florida. Hotel surveillance video confirmed that Serrano was at a La Quinta Inn

(La Quinta) in Atlanta, Georgia, several hours before and after the murders occurred in Bartow, Florida.

However, the prosecution maintained that Serrano committed the murders in an approximately ten-hour span between the times that he was seen on the security camera. According to the prosecution, after being recorded by the hotel security camera in the early afternoon, Serrano slipped out of the hotel and, traveling under several aliases, flew from Atlanta to Orlando, where he rented a car, drove to Bartow, Florida, and committed the murders. From there, Serrano allegedly drove to the Tampa International Airport, flew back to Atlanta, and drove from the Atlanta International Airport to the La Quinta, to make an appearance on the hotel's security footage once again that evening.

Mason argued that it was impossible for his client to have committed the murders in accordance with this timeline; for instance, for the last leg of the journey, Serrano would have had to get off a flight in Atlanta's busy airport, travel to the La Quinta several miles away, and arrive in that hotel lobby in only twenty-eight minutes. After extensively describing the delays that would take place to render that twenty-eight-minute timeline even more unlikely,[1] Mason stated, "I

---

[1] For example, Mason noted that, "in Atlanta, depending on which concourse you're landing in, you're going to have to wait to get off the airplane. . . . You got people boxed in—the lady with the kids in the carriage. Or people getting down their bags. Or the fat one can't get down the aisle. I mean, whatever the story is, you've got delays in getting off the airplane. . . . Then you have to go from whatever gate you are, . . . to catch the subway train to the terminal.

challenge anybody to show me, and guess what?  Did they bring in any evidence to say that somebody made that route, did so?  State's burden of proof.  If they can do it, I'll challenge 'em.  I'll pay them a million dollars if they can do it."

NBC did not broadcast Mason's original interview during Serrano's trial.  At the conclusion of the trial, the jury returned a guilty verdict in Serrano's case.  Thereafter, in December 2006, NBC featured an edited version of Mason's interview in a national broadcast of its "Dateline" television program.  The edited version removed much of the surrounding commentary, including Mason's references to the State's burden of proof, and Mason's statement aired as, "I challenge anybody to show me—I'll pay them a million dollars if they can do it."

Enter Kolodziej, then a law student at the South Texas College of Law, who had been following the Serrano case.  Kolodziej saw the edited version of Mason's interview and understood the statement as a serious challenge, open to anyone, to "make it off the plane and back to the hotel within [twenty-eight] minutes"—that is, in the prosecution's timeline—in return for one million dollars.

Kolodziej subsequently ordered and studied the transcript of the edited interview, interpreting it as an offer to form a unilateral contract—an offer he

---

Wait for that.  Wait while it stops in the meantime.  People getting on and off.  Get to that.  Go up again, the escalators.  Get to where you're in the terminal, out the terminal to ground transportation. And from there to be on the videotape in 28 minutes."

decided to accept by performing the challenge.  In December 2007, Kolodziej recorded himself retracing Serrano's alleged route, traveling from a flight at the Atlanta airport to what he believed was the former location of the now-defunct La Quinta within twenty-eight minutes.  Kolodziej then sent Mason a copy of the recording of his journey and a letter stating that Kolodziej had performed the challenge and requested payment.  Mason responded with a letter in which he refused payment and denied that he made a serious offer in the interview.  Kolodziej again demanded payment, and Mason again refused.

Considering Mason's refusal to pay a breach of contract, Kolodziej sued Mason and Mason's law firm, J. Cheney Mason, P.A., in the United States District Court for the Southern District of Texas.  Although the court dismissed the case for lack of personal jurisdiction, it was then that Kolodziej discovered the existence of Mason's unedited interview with NBC and learned that Dateline had independently edited the interview before it aired.[2]  Kolodziej subsequently filed suit in the United States District Court for the Northern District of Georgia.  That suit was transferred to the Middle District of Florida, where Mason moved for summary judgment.

---

[2] The parties do not dispute that Mason was not involved in any of the editing or broadcast decisions made by the network; that he did not see the program when it aired; and that he was not even aware that Dateline edited his interview until Kolodziej contacted him to demand payment.

5

The district court granted summary judgment on two grounds: first, Kolodziej was unaware of the unedited Mason interview at the time he attempted to perform the challenge, and thus he could not accept an offer he did not know existed; second, the challenge in the unedited interview was unambiguously directed to the prosecution only, and thus Kolodziej could not accept an offer not open to him. The district court declined to address the arguments that Mason's challenge was not a serious offer and that, in any event, Kolodziej did not adequately perform the challenge. This appeal ensued.

## II.

Sitting in diversity, the district court properly applied Florida law to Kolodziej's breach-of-contract claim; in considering Kolodziej's appeal, we too look to the substantive law of the State of Florida. *See Allison v. Vintage Sports Plaques*, 136 F.3d 1443, 1445 (11th Cir. 1998) (citing *Erie R.R. Co. v. Tompkins*, 304 U.S. 64, 58 S. Ct. 817 (1938)).

We review a district court's grant of summary judgment de novo. *Iraola & CIA, S.A. v. Kimberly-Clark Corp.*, 325 F.3d 1274, 1283 (11th Cir. 2003). A grant of summary judgment may be upheld on any basis supported by the record. *Fitzpatrick v. City of Atlanta*, 2 F.3d 1112, 1117 (11th Cir. 1993).

III.

The case before us involves the potential creation of an oral, unilateral contract.[3]  Under Florida law, the question of whether a valid contract exists is a threshold question of law that may be properly decided by the court.  *See Acumen Constr., Inc. v. Neher*, 616 So. 2d 98, 99 (Fla. Dist. Ct. App. 1993); *accord Leonard v. Pepsico, Inc.*, 88 F. Supp. 2d 116, 122 (S.D.N.Y. 1999), *aff'd* 210 F.3d 88 (2d Cir. 2000) (per curiam).

 "To prove the existence of a contract, a plaintiff must plead: (1) offer; (2) acceptance; (3) consideration; and (4) sufficient specification of the essential terms."  *Vega v. T-Mobile USA, Inc.*, 564 F.3d 1256, 1272 (11th Cir. 2009) (citing *St. Joe Corp. v. McIver*, 875 So. 2d 375, 381 (Fla. 2004)).  An oral contract is subject to all basic requirements of contract law, *St. Joe Corp.*, 875 So. 2d at 381, and mutual assent is a prerequisite for the formation of any contract, *see Gibson v. Courtois*, 539 So. 2d 459, 460 (Fla. 1989) ("Mutual assent is an absolute condition

---

[3] While most contracts are bilateral, with promises exchanged between two parties, a unilateral contract is, as the name implies, one-sided—one party promises to do something (for example, pay money) in exchange for performance (an act, forbearance, or conduct producing a certain result).  *See Ballou v. Campbell*, 179 So. 2d 228, 229–30 (Fla. Dist. Ct. App. 1965).

As the parties note, unilateral contract law is a rarely litigated issue, and this particular subset of unilateral contracts is rarer still, involving the public offer of payment (a reward) for disproving a particular claim.  *See, e.g.*, *Rosenthal v. Al Packer Ford, Inc.*, 374 A.2d 377, 380 (Md. Ct. Spec. App. 1977) (describing "the 'I'll pay you if you prove me wrong' category"); *but see* Hon. Michael M. Baylson, et al., 7 Bus. & Com. Litig. Fed. Cts. § 78:11 n.15 (3d ed.) (noting that, although modern courts continue to use the term unilateral contract, some scholarly sources support that the "dichotomy between bilateral and unilateral plays a less important role in contemporary analysis of contracts" (internal quotation marks omitted)).

precedent to the formation of the contract."); *Jacksonville Port Auth. v. W.R. Johnson Enters. Inc.*, 624 So. 2d 313, 315 (Fla. Dist. Ct. App. 1993) ("In order to create a contract it is essential that there be reciprocal assent to a certain and definite proposition." (internal quotation marks omitted)); *Barroso v. Respiratory Care Servs., Inc.*, 518 So. 2d 373, 376 (Fla. Dist. Ct. App. 1987) (noting that mutual or reciprocal assent must be proven to establish an oral contract).

Mutual assent is not necessarily an independent "element" unto itself; rather, we evaluate the existence of assent by analyzing the parties' agreement process in terms of offer and acceptance.[4] *See Newman v. Schiff*, 778 F.2d 460, 465 (8th Cir. 1985). A valid contract—premised on the parties' requisite willingness to contract—may be "manifested through written or spoken words, or inferred in whole or in part from the parties' conduct." *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. Dist. Ct. App. 2011) (internal quotation marks omitted). We use "an objective test . . . to determine whether a contract is enforceable." *See Robbie v. City of Miami*, 469 So. 2d 1384, 1385 (Fla. 1985); *see also Leonard*, 88 F. Supp. 2d at 128 (noting that the determination of whether a party made an offer to enter into a contract requires "the [c]ourt to determine how a

---

[4] The scholarly definitions of an offer reflect this concept by including the integral component of assent. *See, e.g.*, *Corbin on Contracts* § 1.11 (revised ed. 1993) (defining an offer as "an expression by one party of assent to certain definite terms, provided that the other party involved in the bargaining transaction will likewise express assent to the same terms"); *Restatement (Second) of Contracts* § 24 (1981) ("An offer is the manifestation of willingness to enter into a bargain, so made as to justify another person in understanding that his assent to that bargain is invited and will conclude it.").

reasonable, objective person would have understood" the potential offeror's communication).

## IV.

We do not find that Mason's statements were such that a reasonable, objective person would have understood them to be an invitation to contract, regardless of whether we look to the unedited interview or the edited television broadcast seen by Kolodziej. Neither the content of Mason's statements, nor the circumstances in which he made them, nor the conduct of the parties reflects the assent necessary to establish an actionable offer—which is, of course, essential to the creation of a contract.

As a threshold matter, the "spoken words" of Mason's purported challenge do not indicate a willingness to enter into a contract. *See L & H Constr. Co.*, 55 So. 3d at 634. Even removed from its surrounding context, the edited sentence that Kolodziej claims creates Mason's obligation to pay (that is, "I challenge anybody to show me—I'll pay them a million dollars if they can do it") appears colloquial. The exaggerated amount of "a million dollars"—the common choice of movie villains and schoolyard wagerers alike—indicates that this was hyperbole. As the district court noted, "courts have viewed such indicia of jest or hyperbole as providing a reason for an individual to doubt that an 'offer' was serious." *See Kolodziej v. Mason*, 996 F. Supp. 2d 1237, 1252 (M.D. Fla. 2014) (discussing, in

9

dicta, a laughter-eliciting joke made by Mason's co-counsel during the interview). Thus, the very content of Mason's spoken words "would have given any reasonable person pause, considering all of the attendant circumstances in this case." *See id.*

Those attendant circumstances are further notable when we place Mason's statements in context. As Judge Learned Hand once noted, "the circumstances in which the words are used is always relevant and usually indispensable." *N.Y. Trust Co. v. Island Oil & Transp. Corp.*, 34 F.2d 655, 656 (2d Cir. 1929); *see Lefkowitz v. Great Minneapolis Surplus Store, Inc.*, 86 N.W.2d 689, 691 (Minn. 1957) (noting that the existence of an offer "depends on the legal intention of the parties and the surrounding circumstances"). Here, Mason made the comments in the course of representing a criminal defendant accused of quadruple homicide and did so during an interview solely related to that representation. Such circumstances would lead a reasonable person to question whether the requisite assent and actionable offer giving rise to contractual liability existed. Certainly, Mason's statements—made as a defense attorney in response to the prosecution's theory against his client—were far more likely to be a descriptive illustration of what that attorney saw as serious holes in the prosecution's theory instead of a serious offer to enter into a contract.

Nor can a valid contract be "inferred in whole or in part from the parties' conduct" in this case.  *See L & H Constr. Co.*, 55 So. 3d at 634 (internal quotation marks omitted); *see also Commerce P'ship 8098 LP v. Equity Contracting Co.*, 695 So. 2d 383, 385 (Fla. Dist. Ct. App. 1997), *as modified on clarification* (June 4, 1997) (noting that contracts that have not been "put into promissory words with sufficient clarity" may still be enforceable, but they "rest upon the assent of the parties" (internal quotation marks omitted)).  By way of comparison, consider *Lucy v. Zehmer*, 84 S.E.2d 516 (Va. 1954), the classic case describing and applying what we now know as the objective standard of assent.[5]  That court held that statements allegedly made "in jest" *could* result in an offer binding the parties to a contract, since "the law imputes to a person an intention corresponding to the reasonable meaning of his words and acts."  *Id.* at 522.  Therefore, "a person cannot set up that he was merely jesting when his conduct and words would warrant a reasonable person in believing that he intended a real agreement."  *Id.*

In so holding, the *Lucy* court considered that the offeror wrote, prepared, and executed a writing for sale; the parties engaged in extensive, serious discussion prior to preparing the writing; the offeror prepared a second written agreement,

---

[5] *See, e.g.*, Keith A. Rowley, *You Asked for It, You Got It . . . Toy Yoda: Practical Jokes, Prizes, and Contract Law*, 3 Nev. L.J. 526, 527 & n.7 (2003) (characterizing *Lucy v. Zehmer* as "[t]he case best known to contemporary American attorneys, judges, and law professors" for the objective assent standard and collecting the plethora of contracts casebooks in which *Lucy* appears as a principal case).

11

having changed the content of the writing in response to the offeree's request; the offeror had his wife separately sign the writing; and the offeror allowed the offeree to leave with the signed writing without ever indicating that it was in jest. *Id.* at 519–22. Given that these "words and acts, judged by a reasonable standard, manifest[ed] an intention to agree," the offeror's "unexpressed state of . . . mind" was immaterial. *Id.* at 522. Under the objective standard of assent, the *Lucy* court found that the parties had formed a contract. *See id.*

Applying the objective standard here leads us to the real million-dollar question: "What did the party say and do?" *See Newman*, 778 F.2d at 464. Here, it is what both parties did not say and did not do that clearly distinguishes this case from those cases where an enforceable contract was formed. Mason did not engage in any discussion regarding his statements to NBC with Kolodziej, and, prior to Kolodziej demanding payment, there was no contact or communication between the parties.[6] Mason neither confirmed that he made an offer nor asserted that the offer was serious.[7] Mason did not have the payment set aside in escrow;[8]

---

[6] *Cf. Lucy*, 84 S.E.2d at 520–21 (describing the parties' extensive discussion prior to and during the creation of the contract).

[7] Compare with *Barnes v. Treece*, where, after seeing news reports that Treece stated he would "put a hundred thousand dollars to anyone to find a crooked board," Barnes telephoned Treece and asked if his earlier statement had been made seriously. 549 P.2d 1152, 1154 (Wash. Ct. App. 1976). Treece "assured Barnes that the statement had been made seriously [and] advised Barnes that the statement was firm." *Id.* Thus, the trial court found that "Treece's statements before the gambling commission and reiterated to Barnes personally on the telephone constituted a valid offer for a unilateral contract." *Id.*; *see also Newman*, 778 F.2d at 463, 466

nor had he ever declared that he had money set aside in case someone proved him

wrong.[9]  Mason had not made his career out of the contention that the

prosecution's case was implausible;[10] nor did he make the statements in a

commercial context for the "obvious purpose of advertising or promoting [his]

goods or business."[11]  He did not create or promote the video that included his

_____

(finding that the confirmative statement, "I did make an offer," was pertinent to the question of whether a rebroadcast of an offer also constituted an offer).

[8] In the seminal case of *Carlill v. Carbolic Smoke Ball Co.*, which found that an advertisement can constitute an offer to form a unilateral contract, the same advertisement promising the reward included the statement: "1000£ is deposited with the Alliance Bank, Regent Street, shewing our sincerity in the matter."  (1892) 2 Q.B. 484, 484–85, *aff'd*, (1893) 1 Q.B. 256 (Eng.); *see also Barnes*, 549 P.2d at 1154 ("[Treece] informed Barnes that the $100,000 was safely being held in escrow.").

[9] *Cf. James v. Turilli*, 473 S.W.2d 757, 761 (Mo. Ct. App. 1971).  In *James*, Turilli stated before a nationwide television audience that Jesse James didn't die in 1882 and that Turilli "would pay Ten Thousand Dollars ($10,000.00) to anyone . . . who could prove [him] wrong." *Id.* at 759 (internal quotation marks omitted).  In finding that this constituted an offer, the court noted that, in addition to other evidence, Turilli had previously said that he had a "certified check of ten thousand dollars" to be collected upon proof that Jesse James had actually died in 1882. *Id.* at 761.

[10] In *Newman*, a "self-styled 'tax rebel,'" who "made a career and substantial profits out of his tax protest activities" and "promoted his books by appearing on over five hundred radio and television programs," 778 F.2d at 461–62, made a valid, time-limited offer when, in a live television appearance, he stated, "If anybody calls this show . . . and cites any section of this Code that says an individual is required to file a tax return, I will pay them $100,000," *id.* at 462 (internal quotation marks omitted); *see also James*, 473 S.W.2d at 761 (noting that "[Turilli] had virtually made a career out of his contention Jesse W. James was not killed in 1882").

[11] *Rosenthal*, 374 A.2d at 379.  Here, any promotional benefit that Mason might have received by appearing in the interview was incidental, not the "obvious purpose."  Rather, his televised appearance and his statements were on behalf of his client and went to the implausibility of the prosecution's case against his client.  Further, even a commercial advertisement will generally constitute an offer only when it is "clear, definite, and explicit, and leaves nothing open for negotiation."  *See Lefkowitz*, 86 N.W.2d at 691.

13

statement, nor did he increase the amount at issue.[12]  He did not, nor did the show

include, any information to contact Mason about the challenge.[13]  Simply put,

Mason's conduct lacks any indicia of assent to contract.[14]

In fact, none of Mason's surrounding commentary—either in the unedited

original interview or in the edited television broadcast—gave the slightest

indication that his statement was anything other than a figure of speech.  In the

course of representing his client, Mason merely used a rhetorical expression to

raise questions as to the prosecution's case.  We could just as easily substitute a

comparable idiom such as "I'll eat my hat" or "I'll be a monkey's uncle" into

Mason's interview in the place of "I'll pay them a million dollars," and the

outcome would be the same.  We would not be inclined to make him either

---

[12] Compare with *Augstein v. Leslie*, where, in YouTube videos, news articles, and online postings on social media, Leslie stated he would pay a reward to anyone who returned his stolen laptop, gradually increasing the sum to one million dollars.  No. 11 Civ. 7512, 2012 WL 4928914, *2–3 (S.D.N.Y. Oct. 17, 2012).  Given the increase in the offer amount, the value of the property lost, and Leslie's postings, the court found that "Leslie's videos and other activities together [were] best characterized as an offer for a reward."  *Id.* at *2.

[13] *Cf. Newman*, 778 F.2d at 462.  During Schiff's live interview on national television program, wherein Schiff made statements constituting an offer, "[t]he words 'Nightwatch Phone-In' and the telephone number [for the show] were flashed on the screen periodically during Schiff's appearance.  In addition, [the interviewer] repeated the telephone number and encouraged viewers to call and speak directly with Schiff on the air."  *Id.*

[14] Correspondingly, in *Leonard v. Pepsico, Inc.*, Pepsi's advertisement of a Harrier Fighter jet for 7,000,000 "Pepsi Points" did not result in a valid offer or enforceable contract because "no reasonable, objective person would have understood the commercial to make a serious offer."  88 F. Supp. 2d at 130–31.

14

consume his headwear or assume a simian relationship were he to be proven wrong; nor will we make him pay one million dollars here.[15]

Additionally, an enforceable contract requires mutual assent as to sufficiently definite essential terms. *See Tiara Condo. Ass'n v. Marsh & McLennan Cos.*, 607 F.3d 742, 746 (11th Cir. 2010), *certified question answered*, 110 So. 3d 399 (Fla. 2013) ("Under Florida law, a claim for breach of an oral contract arises only when the parties mutually assented to a certain and definite proposition and left no essential terms open. " (internal quotation marks omitted)); *Holloway v. Gutman*, 707 So. 2d 356, 357 (Fla. Dist. Ct. App. 1998) ("Whether a contract is oral or written, it is essential that the parties mutually agree upon the material terms."). Here, even the proper starting and ending points for Mason's purported challenge were unspecified and indefinite; Kolodziej had to speculate and decide for himself what constituted the essential terms of the challenge. For instance, in the prosecution's theory of the case, Serrano, using an alias, was seated in the coach section of an aircraft loaded with over one hundred other passengers. Kolodziej, however, purchased a front row aisle seat in first class and started the

---

[15] However, unenforceable is not quite the same as "unlitigable," since some people might still take such a challenge literally. For example, Donald Trump recently sued Bill Maher for breach of contract after Maher stated on national television that he would offer five million dollars to Trump, donatable to the charity of Trump's choice, if Trump proved that he was not the spawn of an orangutan. *See* Compl., *Trump v. Maher*, No. BC499537 (Cal. Sup. Ct. filed Feb. 4, 2013), *available at* http://pmcdeadline2.files.wordpress.com/2013/02/trump-maher__130205003242.pdf. Trump claimed to accept this offer by providing a copy of his birth certificate as proof of his non-orangutan origin, filing suit when Maher did not respond to his demand for payment. Trump later voluntarily dismissed the suit.

twenty-eight-minute countdown from that prime location. Comparably, Kolodziej did not finish his performance in the La Quinta lobby; rather, Kolodziej ended the challenge at an EconoLodge, which, based on anecdotal information, he believed was the former location of the La Quinta in which Serrano stayed.

We highlight these differences not to comment as to whether Kolodziej adequately performed the challenge—which the parties dispute for a multitude of additional reasons—but instead to illustrate the lack of definiteness and specificity in any purported offer (and absence of mutual assent thereto). It is challenging to point to anything Mason said or did that evinces a "display of willingness to enter into a contract on specified terms, made in a way that would lead a reasonable person to understand that an acceptance, having been sought, will result in a binding contract." *See Black's Law Dictionary* 1189 (9th ed. 2009) (defining "offer" in contract law); *see also Tiara Condo. Ass'n*, 607 F.3d at 746. Therefore, we conclude that Mason did not manifest the requisite willingness to contract through his words or conduct, and no amount of subsequent effort by Kolodziej could turn Mason's statements into an actionable offer.

In further illustration of the lack of assent to contract in this case, we question whether even Kolodziej's conduct—his "acceptance"—manifested assent to any perceived offer. Under the objective standard of assent, we do not look into the subjective minds of the parties; the law imputes an intention that corresponds

16

with the reasonable meaning of a party's words and acts.  *See Lucy*, 84 S.E.2d at 522.  We thus find it troublesome that, in all this time—ordering the transcript, studying it, purchasing tickets, recording himself making the trip—Kolodziej never made any effort to contact Mason to confirm the existence of an offer, to ensure any such offer was still valid after Serrano's conviction, or to address the details and terms of the challenge.[16]  However, we will not attribute bad intent when inexperience may suffice.  Kolodziej may have learned in his contracts class that acceptance by performance results in an immediate, binding contract and that notice may not be necessary, but he apparently did not consider the absolute necessity of first having a specific, definite offer and the basic requirement of mutual assent.  We simply are driven to ask, as Mason did in his response letter: "Why did you not just call?"  Perhaps a jurist's interpretation of an old aphorism provides the answer: "If, as Alexander Pope wrote, 'a little learning is a dangerous thing,' then a little learning in law is particularly perilous."[17]

---

[16] This is additionally problematic considering the timeline of events.  The murders took place in 1997; the interview, trial, conviction, sentencing, and broadcast of the edited interview all occurred in 2006.  Yet Kolodziej claims to have accepted Mason's "offer" by attempting the challenge in 2007, a year after the trial had concluded and the sentence had been returned.  These factors raise serious doubts as to whether Kolodziej could even accept the purported offer, given that offers must be accepted within a reasonable time and Mason's client had already been convicted.  *See* 1 *Williston on Contracts* § 5:7 (4th ed.) (observing that, although offers of reward generally do not lapse for a substantial length of time, the reasonable-time analysis requires "taking into account the circumstances surrounding any particular offer").  A reasonable person would have had, at a minimum, hesitations as to whether any actionable offer had lapsed.

[17] Chief Judge Gilbert in *Ginn v. Farley*, 403 A.2d 858, 859 (Md. Ct. Spec. App. 1979) (quoting Alexander Pope, *An Essay on Criticism*, Part II, line 15 (n.p. 1711)).

V.

Finally, summary judgment was procedurally appropriate in this case. Mason's spoken words, the circumstances in which those words were said, and the parties' conduct are all undisputed, and we find "no genuine issue as to whether the parties' conduct implied a contractual understanding." *See Bourque v. F.D.I.C.*, 42 F.3d 704, 708 (1st Cir. 1994) (internal quotation marks omitted) (affirming district court's grant of summary judgment when the "words and actions that allegedly formed a contract" are "so clear themselves that reasonable people could not differ over their meaning"); *Acumen Constr., Inc.*, 616 So. 2d at 99.

As the district court noted, "'It is basic contract law that one cannot suppose, believe, suspect, imagine or hope that an offer has been made.'" *Kolodziej*, 996 F. Supp. 2d at 1251 (quoting *Trefsgar v. Contributors to Pa. Hosp.*, No. CIV.A. 97–488, 1997 WL 214803, at *3 (E.D. Pa. Apr. 23, 1997)); *see Lucy*, 84 S.E.2d at 522 ("[T]he law imputes to a person an intention corresponding to the reasonable meaning of his words and acts."). No reasonable person and no reasonable juror would think, absent any other indicia of seriousness, that Mason manifested willingness to enter into a contract in either the unedited interview or the edited broadcast relied upon by Kolodziej. Accordingly, Kolodziej cannot establish the basic requirements for contract formation. With no assent, there is no actionable offer; with no offer, there is no enforceable contract. *See Gibson*, 539 So. 2d at

18

460 ("Absent mutual assent, neither the contract nor any of its provisions come into existence."). Thus, Kolodziej's breach-of-contract claim was appropriately dismissed on summary judgment.[18]

## VI.

Just as people are free to contract, they are also free *from* contract, and we find it neither prudent nor permissible to impose contractual liability for offhand remarks or grandstanding. Nor would it be advisable to scrutinize a defense attorney's hyperbolic commentary for a hidden contractual agenda, particularly when that commentary concerns the substantial protections in place for criminal defendants. Having considered the content of Mason's statements, the context in which they were made, and the conduct of the parties, we do not find it reasonable to conclude that Mason assented to enter into a contract with anyone for one million dollars. We affirm the district court's judgment in favor of Mason and J. Cheney Mason, P.A.

**AFFIRMED.**

---

[18] Because we find that Mason's statements in these circumstances do not constitute an enforceable contractual offer, regardless of which version of the statements is considered, we need not address Kolodziej's additional arguments with regard to the district court's reasoning. *See Fitzpatrick*, 2 F.3d at 1117 (providing that we may affirm on the basis of any adequate ground, "regardless of whether it is the one on which the district court relied"); *see also Bourque*, 42 F.3d at 708 ("[E]ven if the language of purported assent is susceptible of more than one reasonable interpretation, summary judgment is nevertheless appropriate if none of those interpretations would support the nonmovant's legal argument.").