[PUBLISH]

IN THE UNITED STATES COURT OF APPEALS

FOR THE ELEVENTH CIRCUIT
_____

No. 17-14052
_____

D.C. Docket No. 8:17-cv-00590-MSS-AEP


STEPHEN DYE,
on behalf of themselves and all others
similarly situated,
DOUGLAS BOHN,
on behalf of themselves and all others
similarly situated,

                                                                Plaintiffs - Appellants,

versus

TAMKO BUILDING PRODUCTS, INC.,

                                                                Defendant - Appellee.

_____

Appeal from the United States District Court
for the Middle District of Florida
_____

(November 2, 2018)

Before TJOFLAT, MARCUS, and NEWSOM, Circuit Judges.

NEWSOM, Circuit Judge:

You've undoubtedly heard of—and for that matter probably accepted the terms of—a "shrinkwrap" agreement, which binds a software (or small-electronics) purchaser to an inside-the-box contract if she opens the product and retains it for some specified time.  In this cyber age, you've also almost certainly assented to the terms of a "clickwrap" or "scrollwrap" agreement—for instance, by hitting "I accept" when installing the latest operating system for your smartphone.  This case—not quite as hip but governed by the same basic principles—requires us to determine the enforceability of what, for lack of a better label, we'll call a "shinglewrap" agreement.

Boiled to its essence, the question we must decide is this:  Where a roofing-shingle manufacturer displays on the exterior wrapping of every package of shingles the entirety of its product-purchase agreement—including, as particularly relevant here, a mandatory-arbitration provision—are homeowners whose roofers ordered, opened, and installed the shingles bound by the agreement's terms?  Applying Florida law, we conclude that the homeowners are bound—and must therefore arbitrate any product-related claims that they allege against the manufacturer.  In particular, we hold (1) that the manufacturer's packaging here sufficed to convey a valid offer of contract terms, (2) that unwrapping and

2

retaining the shingles was an objectively reasonable means of accepting that offer, and (3) that the homeowners' grant of express authority to their roofers to buy and install shingles necessarily included the act of accepting purchase terms on the homeowners' behalf.

**I**

**A**

Tamko Building Products is a Missouri-based roofing company.[1]  Its "Heritage 30" shingles come with (appropriately) a 30-year limited warranty, which is printed—in full—on the outside wrapper of every shingle package. Although most of the warranty is set in ordinary Roman type, several key portions—including those most significant to this appeal—are rendered in a more conspicuous font.  Each package wrapper, for instance, displays the all-capped word "IMPORTANT" and warns the purchaser—again in all caps—to "READ CAREFULLY BEFORE OPENING [THE] BUNDLE."  The wrapper further explains (1) that the consumer must notify Tamko of any warranty-related claims "within thirty (30) days following discovery of the problem with the Shingles" and (2) that the warranty and other purchase terms are available not only on the face of the wrapper itself but also on Tamko's website and via a toll-free telephone number.

---

[1] Although the company's logo reads "TAMKO," we use "Tamko" for the sake of readability.

As particularly relevant to this appeal, Tamko's limited warranty contains a mandatory-arbitration clause—which, significantly, is also printed in its entirety, and in all caps, on the outside of every shingle wrapper. In pertinent part, that clause states as follows:

> **MANDATORY BINDING ARBITRATION**: EVERY CLAIM, CONTROVERSY, OR DISPUTE OF ANY KIND WHATSOEVER (EACH AN "ACTION") BETWEEN YOU AND TAMKO (INCLUDING ANY OF TAMKO'S EMPLOYEES AND AGENTS) RELATING TO OR ARISING OUT OF THE PRODUCT SHALL BE RESOLVED BY FINAL AND BINDING ARBITRATION, REGARDLESS OF WHETHER THE ACTION SOUNDS IN WARRANTY, CONTRACT, STATUTE, OR ANY OTHER LEGAL OR EQUITABLE THEORY.

The warranty further specifies that any action against Tamko must be arbitrated individually rather than as part of a consolidated or class action:

> ANY ACTION BROUGHT BY YOU AGAINST TAMKO WILL BE ARBITRATED (OR, IF ARBITRATION OF THE ACTION IS NOT PERMITTED BY LAW, LITIGATED) INDIVIDUALLY AND YOU WILL NOT CONSOLIDATE, OR SEEK CLASS TREATMENT FOR, ANY ACTION UNLESS PREVIOUSLY AGREED TO IN WRITING BY BOTH TAMKO AND YOU.[2]

## B

Enter Douglas Bohn and Stephen Dye. Both are Florida residents whose homes are fitted with Tamko's Heritage 30 shingles. Bohn hired Duffield Home Improvements to install a new roof on his Middleburg, Florida home. After a few

---

[2] There are actually two wrappers, two purchase agreements, and two arbitration provisions in the record here. Although the language of the agreements and their associated arbitration provisions differs ever so slightly, they are materially identical.

4

years, he noticed that his shingles were crumbling and that asphalt granules were shedding and collecting in his gutters.  Similarly, Dye hired Tampa Roofing Company to replace the roof on his house in Tampa, Florida.  Shortly after installation, Dye too noticed his shingles cracking and granules littering his patio.

Bohn and Dye filed a putative class action seeking damages and declaratory relief on behalf of a class of building owners who had used Tamko shingles.  Their complaint alleged that Tamko manufactured its Heritage 30 shingles with less asphalt than necessary to comply with industry standards and building codes, which caused the shingles to crack and split.  The complaint included claims for breach of express and implied warranties, strict products liability, negligence, and violations of the Florida Deceptive and Unfair Trade Practices Act.  In response, Tamko filed a motion to compel arbitration and an accompanying motion to dismiss or stay court proceedings.  Tamko contended that by unwrapping and retaining its shingles the homeowners had accepted the terms of its purchase agreement and were thus bound, pursuant to the agreement's plain terms, to arbitrate their claims.

The district court granted Tamko's motion and dismissed the homeowners' complaint.  The court reasoned that the homeowners were bound to arbitrate because through their roofers, whom they had hired to buy and install the shingles,

5

they had accepted the terms of Tamko's purchase agreement, including its

mandatory-arbitration provision.  This appeal followed.

## II

On appeal, we must determine whether Tamko's warranty-emblazoned

shingle wrappers set forth a valid offer that gave purchasers an adequate

opportunity to assent to its terms—most notably, the mandatory-arbitration

clause—and, if so, whether the roofers, as the homeowners' agents for the

purposes of purchasing and installing shingles, bound the homeowners to arbitrate

by unwrapping the shingle packages.  We consider each issue in turn.[3]

## A

First up, we consider whether the shingle wrappers conveyed a valid offer of

Tamko's contract terms—in particular, that any product-related dispute must be

arbitrated rather than litigated.  Of course they did, Tamko says, asserting that the

law is well-settled that opening and retaining a product constitutes acceptance of

terms printed on the product's packaging.  The homeowners, by contrast, contend

that consumers aren't on notice that shingles come wrapped in purchase terms and

can't assent to terms of which they are unaware.  The nub of the dispute is whether

---

[3] We review *de novo* the district court's order granting Tamko's motion to dismiss and compel arbitration.  *Bodine v. Cook's Pest Control Inc.*, 830 F.3d 1320, 1324 (11th Cir. 2016) (citation omitted).

Tamko's shingle wrappers provide a reasonable opportunity for consumers to review and accept the company's terms of purchase.

Florida law provides the rules of decision here.[4]  Applying Florida law, we recently held that "[a] valid contract—premised on the parties' requisite willingness to contract—may be 'manifested through written or spoken words, or inferred in whole or in part from the parties' conduct.'"  *Kolodziej v. Mason*, 774 F.3d 736, 741 (11th Cir. 2014) (quoting *L & H Constr. Co. v. Circle Redmont, Inc.*, 55 So. 3d 630, 634 (Fla. 5th Dist. Ct. App. 2011)); *see also* Fla. Stat. § 672.204(1) ("A contract for sale of goods may be made in any manner sufficient to show agreement, including conduct by both parties which recognizes the existence of such a contract.").  Somewhat more specifically, courts applying Florida law have clarified (1) that "[a] vendor, as master of the offer," is free to "invite acceptance by conduct" and in so doing to "propose limitations on the kind of conduct that constitutes acceptance," and (2) that a consumer may, in turn, "accept by performing the acts the vendor proposes to treat as acceptance."  *TracFone Wireless, Inc. v. Pak China Grp. Co.*, 843 F. Supp. 2d 1284, 1298 (S.D. Fla. 2012)

---

[4] Although the Federal Arbitration Act embodies an "emphatic federal policy in favor of arbitral dispute resolution," *KPMG LLP v. Cocchi*, 565 U.S. 18, 21 (2011), this policy does not apply to the threshold question of whether there is "a valid agreement to arbitrate between the parties." *Bd. of Trs. of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 1335, 1342 (11th Cir. 2010) (quotations omitted).  That question is governed instead by the "ordinary state-law principles that govern the formation of contracts." *Bazemore v. Jefferson Capital Sys., LLC*, 827 F.3d 1325, 1329 (11th Cir. 2016) (quoting *First Options of Chi., Inc. v. Kaplan*, 514 U.S. 938, 944 (1995)).

(quotations omitted); *accord, e.g.*, *Salco Distribs., LLC v. iCode, Inc.*, No. 8:05–CV–642, 2006 WL 449156, at \*2 & n.5 (M.D. Fla. Feb. 22, 2006) (quoting *ProCD, Inc. v. Zeidenberg*, 86 F.3d 1447, 1449 (7th Cir. 1996)).

These settled principles give rise to two fundamental inquiries: (1) Would "a reasonable, objective person" have understood an offer as an "invitation to contract," and (2) did that person's "words and acts, judged by a reasonable standard, manifest an intention to agree?" *Kolodziej*, 774 F.3d. at 741–42 (quotation omitted).  In considering these questions, a court must examine the content of the offer, the circumstances in which the offer was made, and the conduct of the parties—all the while keeping firmly in mind that "[t]he law imputes to a person an intention corresponding to the reasonable meaning of his words and acts." *Id*. at 742 (quoting *Lucy v. Zehmer*, 84 S.E.2d 516, 522 (Va. 1954), "the classic case describing and applying what we now know as the objective standard of assent").

As particularly relevant here, courts applying Florida law have recognized that a vendor's prerogative to specify conduct that constitutes acceptance includes inviting acceptance by unwrapping a product.  Take, for instance, *TracFone Wireless, Inc. v. Pak China Group Co. Ltd.*, a shrinkwrap case cited extensively by both parties.  There, a cellphone manufacturer's retail packaging displayed "conspicuous language" specifically "restricting the use of the Phones for

TracFone Prepaid Wireless service and prohibit[ing] the consumer from tampering or altering the software or hardware in the Phone." *TracFone*, 843 F. Supp. 2d at 1298. The language further stated that "[b]y purchasing or opening this package" the consumer agreed to the manufacturer's terms as printed on the wrapper and in the enclosed user guide. *Id.* Applying Florida law, the court held that a consumer's act of opening the package constituted an acceptance of the manufacturer's terms, thereby creating a valid contract. *Id.* at 1298–99.

*Management Computer Controls, Inc.  v. Charles Perry Construction, Inc.*, 743 So. 2d 627 (Fla. 1st Dist. Ct. App. 1999), is similar. There, a computer-software vendor sent a product to a customer with its licensing agreement affixed to the outside of the box, which was itself sealed with an orange sticker warning that "[b]y opening this packet, you indicate your acceptance of the [company's] license agreement." *Id*. at 629. The court deemed this a valid offer and held that the consumer "agreed to the terms of the license agreement by breaking the seal on the software." *Id*. at 631.

This case is cut from the same cloth. Tamko's purchase terms were printed in full on the exterior of every package of shingles, accompanied by text alerting purchasers of an "IMPORTANT" message that they should "READ CAREFULLY BEFORE OPENING [THE] BUNDLE." The agreement required consumers to notify Tamko "within thirty (30) days following discovery of the potential problem

with the Shingles," and further—most importantly here—featured an all-caps, mandatory-arbitration clause.[5]  As in the shrinkwrap cases, Tamko's packaging provided conspicuous notice of its offer—something a reasonable, objective person would understand as an invitation to contract.  *See Kolodziej,* 774 F.3d at 741.  For the homeowners' part, opening and retaining the shingles was the (quite ordinary, reasonable) conduct from which their assent can be "inferred."  *See id.*

The homeowners acknowledge that Florida law recognizes "shrinkwrap" contracting but contend that the nature of the product here calls for a different analysis.  It's a fair point.  Software packaging of the sort typically involved in a shrinkwrap case is fairly small, usually delivered directly to (and sometimes retained by) the end user, and often includes at least some notice of terms printed both on the outside and inside of the package.  By contrast, shingle packages are large and unwieldy, are often delivered to contractors rather than end users, are quite unlikely to be kept following installation, and in this case sported terms

---

[5] The homeowners assert, for the first time on appeal, that this Court needn't reach the issue of assent (or agency, *see infra*) because Tamko failed to provide the district court sufficient evidence of its shingle wrapper, leaving the court unable to evaluate whether the purchase terms were conspicuous enough to provide sufficient notice of the offer.  In particular, the homeowners contend that a Tamko employee's affidavit, which describes and reproduces the purchase agreement—including the arbitration provision—isn't good enough, and that either an actual shingle wrapper or a photograph was necessary.  The homeowners did not, however, dispute the sufficiency (or form) of the evidence in the district court, but rather have been arguing the merits of assent (and agency) all along.  Absent special circumstances, which we conclude do not exist here, we will not address an argument raised for the first time on appeal.  *See Access Now, Inc. v. Sw. Airlines Co.*, 385 F.3d 1324, 1335 (11th Cir. 2004).

printed only once on the outer wrapping.  These differences matter, the argument presumably goes, because Florida law tasks courts with determining whether "a reasonable, objective person" would have understood Tamko's packaging as "an invitation to contract."  *Kolodziej*, 774 F.3d at 741.  And it's just not clear that consumers have the same realistic opportunity to review shingle (or floorboard, siding, or tile) packaging as they would software packaging.

To be sure, there are distinctions between small-box and big-box items, but those distinctions neither alter the underlying principles nor require a different result.  Indeed, they arguably cut in different ways.  On the one hand, for instance, it's surely true that a consumer (or his agent—more on that below) is less likely to keep shingle packaging than software packaging after unwrapping the product.  On the other hand, one of the things that has historically made shrinkwrap cases tricky is that the full purchase terms "are typically provided *inside* the packaging of consumer goods," while the outer packaging bears only a notice or excerpt of those terms—leading courts to hold that valid acceptance occurs not upon purchase or opening, but rather only upon the purchaser's "failure to return the product after reading, or at least having a realistic opportunity to read, the terms and conditions of the contract included with the product."  *Schnabel v. Trilegiant Corp.*, 697 F.3d

11

110, 121–22 (2d Cir. 2012) (emphasis added).[6]  Here, by contrast—in the quintessential belt-and-suspenders move—Tamko has emblazoned its entire purchase-agreement (complete with terms, warnings, and the all-important arbitration clause) *in haec verba* on the outside of every package of shingles.  No hidden terms—no buried treasure.

Moreover, and in any event, that big-box items come with purchase terms and conditions should hardly come as a surprise to modern consumers.  Post-purchase, acceptance-by-retention warranties are ubiquitous today—think furniture, home appliances, sporting goods, etc.  It's not only objectively reasonable to assume that such items come with terms and conditions, it's also eminently reasonable to assume that by opening and retaining those items a consumer necessarily accepts the accompanying terms and conditions.  *See Kolodziej*, 774 F.3d at 742 ("[T]he law imputes to a person an intention

---

[6] While shrinkwrap cases generally consist of "[n]otice on the outside, terms on the inside, and a right to return the software for a refund if the terms are unacceptable," *Nicosia v. Amazon.com, Inc.*, 834 F.3d 220, 232 (2d Cir. 2016) (quotation omitted), in some instances shrinkwrap offers further require consumers to click "accept" upon installing the software itself, *see, e.g., Register.com, Inc. v. Verio, Inc.*, 356 F.3d 393, 428 (2d Cir. 2004) (characterizing shrinkwrap licenses as involving (1) "notice of a license agreement on product packaging," (2) "presentation of the full license on documents inside the package," and (3) "prohibited access to the product without an express indication of acceptance"); *ProCD*, 86 F.3d at 1450–53 (requiring consumer to click a button indicating acceptance of terms during software installation, in addition to providing notice on the box and terms inside the box).  And in still other shrinkwrap cases, terms are printed in full on the exterior of the packaging, as in the case before us today.  *See, e.g., Mgmt. Comput. Controls,* 743 So. 2d at 629 (licensing agreement affixed to outside of the box, which was also sealed with an orange "notice" sticker).

12

corresponding to the reasonable meaning of his words and acts." (quotations omitted)).

Indeed, this expectation—and with it, fair notice—has been building for some time. More than 20 years ago, in *Hill v. Gateway 2000*, 105 F.3d 1147 (7th Cir. 1997), the Seventh Circuit rejected a suggestion that its earlier decision in *ProCD, Inc. v. Zeidenberg,* 86 F.3d 1447 (7th Cir. 1996)—the seminal case on shrinkwrap contracts—applied only to software, for precisely this reason. *See Hill*, 105 F.3d at 1149 ("*ProCD* is about the law of contract, not the law of software."). The *Hill* court explained that "[p]ractical considerations support allowing vendors to enclose the full legal terms with their products," employing a "simple approve-or-return" model in place of a "costly and ineffectual" requirement that sellers narrate their terms of purchase "telephonic[ally]." *Id.* When it comes to warranties and other purchase terms, the *Hill* court explained, "[c]ompetent adults are bound by such documents, read or unread." *Id*; *see also id*. at 1148 ("A contract need not be read to be effective; people who accept [the contract] take the risk that the unread terms may in retrospect prove unwelcome.").

All of that applies *a fortiori* two decades hence, in the age of Amazon Prime. As fewer and fewer purchases are consummated face to face, and more and more are made online, consumers should (and must) know that vendors will often employ a "simple approve-or-return" model, enclosing their full legal terms with a

13

product at shipment. Indeed, the sort of "costly and ineffectual" telephonic recitation of terms that the *Hill* court posited is a vanishingly small exception to the norm.[7] Really, how often does the modern consumer, following a large purchase, call a vendor to sit through a verbal oration of warranty terms? Or insist on signing and returning a form to convey acceptance of her latest online purchase, instead of just, oh, say, keeping it?

That's not to imply that consumers *can't* choose to seek out purchase terms by other means should they so choose. Indeed, one key reason that the *Hill* court rejected the "I-didn't-read-it" excuse was that consumers could discover the terms of their desired purchases in one of several ways, such as by "ask[ing] the vendor to send a copy before deciding whether to buy," by "consult[ing] public sources (computer magazines, the Web sites of vendors)," or by "inspect[ing] the documents after the product's delivery." 105 F.3d at 1150. And of course, as we have emphasized, the same is true here—Tamko's purchase terms were available not only on its packaging but also on its website and over the phone, such that a diligent consumer could easily have discovered and reviewed them before or after purchase.

At the end of the day, the point is simply this: modern consumers are on notice that products come with warranties and other terms and conditions of

[7] So much so that the author of today's opinion doesn't even know what the Seventh Circuit was talking about. A "telephonic recitation" of warranty terms?

14

purchase.  And they are free to research (or not), request (or not), and read (or not) those terms before unwrapping their purchases.  As to the case before us, Florida law makes clear that providing conspicuously printed product packaging is an OK way to convey purchase terms.  Florida consumers who purchase, open, and retain a product are thus bound in accordance with warranty terms conspicuously printed on that product's packaging, whether they actually take the time to read them or not.[8]

We can summarize using what this Court has referred to as the "million-dollar question" in evaluating assent: "What did the part[ies] say and do?" *Kolodziej*, 774 F.3d at 743.  By conspicuously printing its purchase terms on its shingle wrappers, Tamko made a valid offer in accordance with Florida law.  As master of that offer, Tamko was free to invite acceptance by specified conduct, and it did—inviting consumers to accept by opening the shingles and retaining them for more than 30 days.  By doing exactly this, the homeowners here "accept[ed] by performing" the acts that Tamko "propose[d] to treat as acceptance," thus "manifest[ing] an intention to agree."  *TracFone*, 843 F. Supp. 2d at 1298; *Kolodziej*, 774 F.3d at 742.  We therefore hold that Tamko made a valid offer—

---

[8] This accords with the basic proposition—embraced by Florida courts—that "one who signs a written instrument without reading it with care" is, in most cases, "bound in accordance with its written terms."  *All Fla. Sur. Co. v. Coker*, 88 So. 2d 508, 510 (Fla. 1956).  Although this appeal concerns unwrapping rather than signing, the principle holds true.  *See Hill*, 105 F.3d at 1149 (speculating that even an oral recitation of terms "would not avoid customers' assertions (whether true or feigned) that the clerk did not read term X to them, or that they did not remember or understand it").

again, including an offer to arbitrate, rather than litigate, all product-related claims—and that its offer was accepted.

## B

Hang on just a minute, the homeowners contend: Even if this was a valid means of making an offer, *they* didn't accept it—their roofers did. After all, the homeowners say, they never saw the shingle packaging and thus never had a reasonable opportunity to consider Tamko's purchase terms—arbitration clause included—so they can't possibly be bound by them. Attributing the roofers' acceptance to them would be, the homeowners assert, an "ill-advised" and "unsupported" expansion of agency law. We disagree. Imputing the roofers' notice and acceptance of Tamko's purchase terms to the homeowners requires no expansion, but rather fits squarely within established agency-law principles and precedent.

Let's start with the basics. "[A]n agency relationship requires (1) the principal to acknowledge that the agent will act for it; (2) the agent to manifest an acceptance of the undertaking; and (3) control by the principal over the actions of the agent.'" *Franza v. Royal Caribbean Cruises, Ltd.*, 772 F.3d 1225, 1236 (11th Cir. 2014) (quotation omitted). Importantly here, we have further held—applying Florida law—that a grant of agency authority also necessarily implies "the authority to do acts that are 'incidental to it, usually accompany it, or are

16

reasonably necessary to accomplish it.'"  *Bd. of Trs. of City of Delray Beach Police & Firefighters Ret. Sys. v. Citigroup Glob. Mkts., Inc.*, 622 F.3d 1335, 1342–43 (11th Cir. 2010) (quoting 2 Fla. Jur.2d *Agency & Employment* § 47 (2005)).[9]  As examples of this "incidental-to" authority, Florida courts have held, for example, that real-estate agents charged with selling property have authority to purchase surveying services on behalf of their principals, *Bradley v. Waldrop*, 611 So. 2d 31, 32–33 (Fla. 1st Dist. Ct. App. 1992), and "to make representations concerning the description and characteristics of the property to be sold," *Outlaw v. McMichael*, 397 So. 2d 1009, 1010 (Fla. 1st Dist. Ct. App. 1981).

This case is similar.  Neither party seriously disputes that the roofers were the homeowners' agents for purposes of purchasing and installing shingles.  Both homeowners expressly delegated those tasks to their roofers, their roofers accepted those tasks by signing contracts, and the homeowners maintained control over their roofers' completion of those tasks pursuant to those contracts.  *See Franza*, 772 F.3d at 1236.  The question, then, is whether accepting Tamko's purchase terms—including an arbitration provision—was "incidental to," "usually accompany[ing]," or "reasonably necessary to accomplish" the purchase and installation of the shingles.  *See Delray Beach*, 622 F.3d at 1342–43.

---

[9] *See also Restatement (Third) of Agency* § 2.02 cmt. d (Am. Law. Inst. 2006) ("If a principal's manifestation to an agent expresses the principal's wish that something be done, it is natural to assume that the principal wishes, as an incidental matter, that the agent take the steps necessary and . . . proceed in the usual and ordinary way[.]").

The homeowners admit that they contracted with their roofers to buy shingles, and even that the roofers might have known that by opening the shingles, *they*—*i.e.*, the roofers—were entering into an agreement with Tamko. But the homeowners dispute that this necessarily means that the roofers accepted Tamko's purchase terms—including, as we keep saying, the arbitration clause—*on the homeowners' behalf*. Had they made clear that their roofers could enter into binding contracts on their behalf, the homeowners contend, that grant might have encompassed agreeing to the arbitration provision. But, they say, a "circumscribed contract . . . to buy and install shingles does not bring with it the authority to enter into any other contract whatsoever regarding those shingles."

We think the homeowners are missing the point. Accepting the purchase terms is not "any other contract . . . regarding those shingles"—it *is* the contract regarding those shingles. Purchasing a product necessarily and by definition encompasses accepting the terms of that purchase. The homeowners here expressly delegated to their roofers the task of purchasing shingles, and yet they now contest terms—in particular, those requiring mandatory arbitration—that are part and parcel of that purchase. In the language of our precedent, accepting purchase terms is "incidental to," "usually accompany[ing]," and "reasonably necessary to" the act of purchasing. And Florida law is clear that, in this respect at least, arbitration terms are no different from any others: "[A]n agent can bind

18

a principal to an arbitration agreement just like any other contract." *Fi–Evergreen Woods, LLC v. Estate of Robinson*, 172 So. 3d 493, 497 (Fla. 5th Dist. Ct. App. 2015).[10]

Even aside from our "incidental-to" precedent, it is axiomatic under Florida law—and more generally—that knowledge or notice that an agent acquires while acting within the course and scope of his authority is generally imputed to his principal. *See, e.g.*, *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1095 (11th Cir. 2017); *Restatement (Third) Of Agency* § 5.03 ("For purposes of determining a principal's legal relations with a third party, notice of a fact that an agent knows or has reason to know is imputed to the principal if knowledge of the fact is material to the agent's duties to the principal[.]"). Here, Tamko's purchase terms were printed on the shingle packaging, which the homeowners agree their roofers opened. Because the notice that their roofers acquired while acting within the scope of their authority to purchase and install the shingles is properly imputed to them, the homeowners cannot now plead ignorance of the offer's existence.

To summarize, then, acceptance of Tamko's purchase terms—arbitration clause and all—was incidental to, and reasonably necessary to accomplish, the

---

[10] To the extent that the homeowners argue that their roofers may bind them to some purchase terms, but not those pertaining to arbitration, the contention is foreclosed by recent Supreme Court precedent. *See Kindred Nursing Ctrs. Ltd. P'ship v. Clark*, 137 S. Ct. 1421, 1425 (2017) (confirming that arbitration agreements may not be singled out for unfavorable treatment); *see also Fi–Evergreen Woods*, 172 So. 3d at 497 ("There is no special rule requiring the principal to independently waive the right to a jury trial or expressly and separately acknowledge or agree that the agent is also authorized to waive a jury trial on his or her behalf.").

homeowners' express grant of agency authority to their roofers to purchase and install shingles, and in any event, the roofers' notice of the terms printed on the shingle wrappers is properly imputed to the homeowners.

### III

As "master of the offer," Tamko invited purchasers to accept its contract terms by opening and retaining the shingles—a reasonable means of acceptance-by-conduct under Florida law. The homeowners, through their roofer agents, validly accepted those terms—Tamko's binding arbitration provision included. We therefore affirm the district court's decision to grant Tamko's motion to compel arbitration and to dismiss the homeowners' complaint.

**AFFIRMED.**

20